The State ex rel. Attorney General v. Schweickardt.

THE STATE *ex rel.* WOOD, *Attorney General, Appellant,*
v. SCHWEICKARDT *et al.*

### DIVISION ONE.

1. **St. Louis City:** FOREST PARK: SELLING INTOXICATING LIQUORS. The act of the legislature of March 9, 1875 (Laws, p. 417), enacting that no building or stand for the sale of intoxicating liquors shall be maintained "within a distance embraced within the limits of eight hundred feet outside of the boundary" of Forest Park, does not prohibit the maintenance of such stand or building within the limits of said park.

2. ———: ———: ———: LEASE. A contract in writing made by the board of public improvements of the city of St. Louis with one for the exclusive privilege of selling refreshments and intoxicating liquors in Forest Park, and giving the "lessee" possession of certain buildings on the premises, *held* not to be in effect a technical lease, nor in violation of the provision of the city charter that no sale or lease of any park shall be made unless the ordinance providing therefor shall be submitted to a vote of the people.

3. ———: ———: ———. Under the power given to the city to regulate all parks belonging to it, the city can provide rules for the management and government of the park, and secure thereby some one to serve refreshments therein for the benefit of the public, and such use cannot be regarded as any diversion of the legitimate uses of the park.

4. ———: ———: ———. The control of the city over the park is a discretionary one, and is a matter of local concern, the park being held and owned by the city, not in its political or governmental capacity, but in a *quasi* private capacity, in which the municipal authorities act for the exclusive benefit of the corporation whose interests they represent.

5. ———: ———: ———. The provisions of the revised ordinances of St. Louis of 1881 (p. 767), defining a dramshop keeper to be a person permitted by law or ordinance to sell intoxicating liquor in any quantity less than a gallon, and fixing the license and the penalty for selling without a license, apply only to such portions of the city in which such licenses are usually granted, or, if they do apply to the territory within Forest Park, then the contract in this case, allowing the privilege to sell for ten years, is a sufficient license under the section.

The State ex rel. Attorney General v. Schweickardt.

6.  ———: ———: ———: CONSTITUTION. The ordinance authorizing the exclusive contract in this case did not necessarily create a special privilege within the meaning of the constitutional prohibition against irrevocable grants of special privileges and immunities.

7.  **Equity**: MISDEMEANOR. A court of equity will not afford relief by injunction or otherwise to restrain the commission of a misdemeanor where its commission is unconnected with property rights. ·

*Appeal from St. Louis City Circuit Court.*—HON. JACOB KLEIN, Judge.

AFFIRMED.

*Gibson, Bond & Gibson* for appellant.

· (1) The city of St. Louis holds Forest Park for the beneficial enjoyment of the entire body of its citizens and the public, and any diversion to other than legitimate park purposes is illegal. Session Acts of 1874, p. 371; *St. Louis Co. v. Griswold*, 58 Mo. 175; *Rutherford v. Taylor*, 38 Mo. 315; *Price v. Thompson*, 48 Mo. 361; *Cummings v. City*, 90 Mo. 259; 2 Dillon on Municipal Corporations [4 Ed.] secs. 914–922; *Glasgow v. City*, 87 Mo. 678. (2) The liquor business has repeatedly been referred to in judicial decisions as detrimental to public morals. *Austin v. State*, 10 Mo. 591; *State ex rel. v. Hudson*, 78 Mo. 302; *State ex rel. v. Pond*, 93 Mo. 623; *Schmidt v. State*, 14 Mo. 137; *City v. Fitz*, 53 Mo. 585; *State v. Searcy*, 20 Mo. 489; *Mugler v. Kansas City*, U. S. Sup. Ct. (3) By an act of the general assembly, approved March 29, 1875, the sale of liquor is forbidden within Forest Park. Session Acts of 1875, p. 417. (4) An ordinance that violates the spirit and true intent of a legislative enactment is void. 1 Dillon on Municipal Corporations [4 Ed.] sec. 329. (5) The judiciary may pass on the validity of ordinances, and

set them aside if unreasonable. *Railroad v. City*, 85 Mo. 674; *Kelly v. Meeks*, 87 Mo. 401; *Corrigan v. Gage*, 68 Mo. 545; 1 Dillon on Municipal Corporations [4 Ed.] secs. 319, 327. (6) Ordinance void, as contravening section 4, article 8, of the city charter. (7) Corporate power must clearly be given by the charter, and the doubt, if it exists, must be resolved against the corporation. *Douglass v. Mayer*, 18 Cal. 647; *Wallace v. Mayer*, 29 Cal. 188; *City v. Cox*, 5 Ind. 38; Cooley on Constitutional Limitations [6 Ed.] p. 47. (8) Ordinance void as an attempt to barter away the police power of the city. *State v. Troll*, 78 Mo. 303; *Butchers' Union v. Crescent Co.*, 111 U. S. 750. (9) Ordinance void as being an attempt to grant a monopoly; hence, contrary to the constitution of the state. State Constitution, art. 4, sec. 53, and art. 2, sec. 15. (10) A corporation possesses only those powers granted in its charter expressly or by necessary implication. *City v. Tel. Co.*, 96 Mo. 628; *Merrill v. Monticello*, U. S. Supt. Ct; 1 Dillon on Municipal Corporations [4 Ed.] sec. 457. (11) There exists no provision in the charter of the city of St. Louis conferring upon it the right of granting an exclusive privilege or monopoly. (12) This action properly brought in the name of the attorney general. *State v. County Court*, 51 Mo. 350; *Matthews v. Town*, 62 Mo. 504; *Cummings v. City*, 90 Mo. 259; *State v. Hagar*, 91 Mo. 455; *Railroad cases*, 35 Wis. 425.

*W. C. Marshall*, for City of St. Louis, respondent.

(1) Under the act of 1874 the commissioners had the power to control the use of Forest Park. (2) The power of the commissioners is now fully vested in the city of St. Louis, under section 20 of article 9 of the constitution of Missouri. (3) Under section 1, article

1, of the charter, the city has the power to lease any property for the benefit of the city. (4) The mayor and assembly have the power, by ordinance, to regulate all parks and public grounds. City Charter, art. 3, sec. 26, par. 3, And that the power to regulate, as defined by the supreme court of the United States, in the case of *Gibbons v. Ogden*, 9 Wheat. *loc. cit.* 196, means: "It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution." This case was cited, adopted and followed by the supreme court of Missouri in the case of *State ex rel. v. Thomas*, in construing the eighth paragraph of this same section (art. 3, sec. 26), which says the "mayor and assembly shall have power * * * to regulate and provide for the election or appointment of city officers required by this charter," etc. (5) A park is "purely a matter of local, as distinguished from state, concern, and it is beyond legislative competency to coerce a municipal corporation to contract a debt for local purposes without its consent." *People ex rel. v. Common Council*, 28 Mich. 228; Dillon on Municipal Corporations [4 Ed.] sec. 72, p. 123, note 1; *Detroit v. Road Co.*, 43 Mich. 140; *Mayor v. Commissioners*, 44 Mich. 602: *Fund Society v. Philadelphia*, 31 Pa. St. 183. (6) Provisions for local conveniences for the citizens, like water, light, public grounds for recreation, and the like, are manifestly matters which are not provided for by municipal corporations in their political or governmental capacity, but in that *quasi* private capacity in which they act for the benefit of their corporations exclusively. Cooley on Taxation [2 Ed.] 688; *Philadelphia v. Fox*, 64 Pa. St. 169, referred to in 1 Dillon on Municipal

Corporations [4 Ed.] sec. 74a, p. 126; *Railroad v. City*, 77 Ill. 505; *People v. Chicago*, 51 Ill. 17; *People v. Solomon*, 51 Ill. 37; *Harard v. Drainage Co.*, 51 Ill. 130. (7) Ordinance 16002, leasing the cottage and outbuildings to defendant Schweickardt and regulating and providing what use they shall be put to, is clearly valid. (8) That ordinance 16002 is not in conflict with, or affected by, the act of March 29, 1875 (Acts, 1875, p. 417), or any law of the state of Missouri or ordinance of the city of St. Louis relating to establishing, opening, conducting or licensing saloons or dramshops within a given distance of Forest Park. (9) Ordinance 16002 is a matter of purely local concern, and does not belong to the political or governmental supervision of the state over the municipality of St. Louis.

SHERWOOD, P. J.—The relator, by this proceeding, prays for an injunction against the defendants, enjoining and restraining them from selling whiskey, wine, liquor or any kind of intoxicating refreshments, in Forest Park; from carrying out the terms and provisions of ordinance number 16002; for a decree declaring said ordinance and the contract made thereunder null and void; for tearing down the cottage, built pursuant to the contract; for the ejection of defendant Schweickardt, and for other and further relief. This petition the defendant city answered, setting up certain constitutional, statutory, charter and ordinance provisions, as justifying her course, and denying the general charges of the petition. Schweickardt, the codefendant, subsequently joined in this answer. Upon a full hearing of the cause, the circuit court dismissed the petition; hence, this appeal.

Ordinance number 16,002, upon which the contract made thereunder this litigation is chiefly bottomed, is.

as follows:   "16002.   An ordinance to lease to Charles Schweickardt the cottage, outbuildings and refreshment privileges in Forest Park.   Be it ordained by the municipal assembly of the city of St. Louis as follows:

"Sec. 1.   The board of public improvements is hereby authorized and directed to enter into a contract in writing with Charles Schweickardt, for the exclusive privilege of selling refreshments in Forest Park, for a period of ten years from the first day of April, 1891, for the annual rental of $1,000 payable monthly in advance, on the terms and conditions herein contained, and this ordinance shall be set out in said contract.

"Sec. 2.   Said lessee shall erect a restaurant building to cost not less than $15,000, upon plans to be approved, and in a place designated by the board of public improvements; and at the expiration or other termination of said contract said building shall become the property of the city of St. Louis, without compensation.   The lessee may also erect and maintain, not to exceed three, ornamental refreshments stands, upon plans and in places designated by the park commissioner.

"Sec. 3.   No public bar shall be maintained within the limits of said park, but all liquors or refreshments shall be served by competent waiters to persons seated at tables to be furnished by said lessee, and no liquors or refreshments shall be furnished or sold in any other way, and no liquors shall be served except at said restaurant building.   The premises of the lessee shall be open to the inspection of the park commissioner, and shall be maintained in a neat and orderly manner, and the buildings kept in good repair, and the orders and directions of the park commissioner in the above matters shall be obeyed and observed.

"Sec. 4.   In the event that the said lessee shall keep said restaurant in a disorderly manner, or shall

fail for thirty days to pay any monthly rental, or shall sell intoxicating liquors to either minors or intoxicated persons, or shall sell or furnish liquors or refreshments otherwise than as stipulated in section 3, or fail to complete the restaurant building within the specified time, then said lessee shall forfeit to the city of St. Louis, as liquidated damages, the sum of $50 for every day either of said acts shall be committed. Whenever said penalties shall reach the sum of $1,000, said lease and this ordinance shall become null and void, and all the buildings and improvements erected and made by said lessee shall be forfeited to the city of St. Louis, and a resolution of the municipal assembly, approved by the mayor, on the above matters or any of them, shall be binding and conclusive on the lessee and his sureties.

"Sec. 5.    The said lessee shall not sell or transfer the rights and privileges granted by this ordinance, without first obtaining an ordinance permitting such assignment to be made.

"Sec. 6.    The provisions of this ordinance shall be accepted by said lessee within thirty days after the approval thereof by the mayor; and the lessee shall complete the erection of said restaurant building within twelve months after the approval of the contract and bond.    During the erection of said restaurant building, said lessee shall have the use of the existing restaurant buildings.

"Sec. 7.    A good and sufficient bond in the sum of $10,000, with sureties to be approved by the mayor and council, shall be executed by said lessee to the city of St. Louis, for the faithful performance of the conditions of this ordinance, and for the payment of rents due or falling due, and all penalties accruing under said contract, and becoming due to the city of St. Louis; and said contract shall be subject to and shall not take

effect until approved by the mayor and council; and said bond shall be renewed from time to time on the order of the mayor.    Nothing in this ordinance shall prevent the park commissioner from granting the privilege of a day to a school or church to sell refreshments other than beer, wine or whiskey for their own use.

"Approved March 6, 1891."

This ordinance was duly consummated by a contract in conformity to its provisions.

I.    It is contended that this ordinance is invalid because of being opposed to the provisions of the act of the legislature approved March 29, 1875.    But if it be true that there is such conflict then such statute must be regarded as abrogated, under the express terms of section 20 of article 9 of the constitution, which declares that upon the adoption of such scheme it "shall become the organic law of the county and city, and such charter the organic law of the city * * * and supersede the charter of St. Louis * * * and all special laws relating to St. Louis county inconsistent with such scheme."    But be that as it may, whether inconsistent with the scheme and charter or not is of no moment, because of the *terms* of that statute.    The prohibition of section 2 of that act is that "no buildings, booths or stands, for the gift or sale of any spirituous, vinous, fermented or malt liquors, shall be erected or kept within a district embraced *within the limits of eight hundred feet outside of the out boundary of said park;* and any person or persons who shall offer for sale or sell any of the liquors aforesaid within the district aforesaid of eight hundred feet shall be deemed guilty of a misdemeanor, and shall be fined, for each and every offense, the sum of $5 to be recovered in the name of the state before any justice of the peace."

This prohibition has its *precise boundaries and its express limitations,* and to attempt to extend such pro-

hibition beyond the plain limits assigned it by the legislative will, is unwarranted by either reason or precedent. That prohibition does not, and never was, intended to apply to *Forest Park itself*, and could not do so, if language has any force or words any meaning; the act of 1875, therefore, constitutes no barrier to the validity of ordinance 16002. This point is too plain for argument. "*Perspicua vera non sunt probanda.*"

II.    But it is said that the ordinance in question is invalid, by reason of the fact that section 28 of article 3 of the charter provides that "no special or general ordinance, which is in conflict or inconsistent with general ordinances of prior date, shall be valid or effectual until such prior ordinance, or the conflicting parts thereof, are repealed by express terms;" and thereupon it is contended that section 8 of article 2 of chapter 37 of the revised ordinances of 1881, which provides, among other things, that "no dramshop shall be located within five hundred feet of LaFayette, Tower Grove, O'Fallon, Carondelet and Forest Parks," not having been repealed in manner as aforesaid, is yet in force, which non-repeal, it is claimed, is fatal to the validity of the ordinance under discussion. But this contention is based on a *mistake of fact;* because the sections of article 2 of said chapter 37 were repealed in express terms by ordinance 12510, approved August 16, 1883, the seventh section of which contained the same provision as section 8 aforesaid. The ordinance last mentioned was, in terms, amended by ordinance 12601, approved December 5, 1883, whereby section 7, as it stood in ordinance 12510, was stricken out, and in its stead another section 7 inserted, the closing provision of which is: "No saloon shall hereafter be established, opened or located in any building, or on any lot of ground within five hundred feet of LaFay-

ette, Tower Grove, O'Fallon, Carondelet and Forest Parks; *provided, that this provision shall not apply to any premises within the prohibited distance on which a saloon has been conducted within the past five years.*"

By a prior ordinance (numbered 11160, approved August 6, 1879), it had been provided that the "cottage and outbuildings connected therewith" in Forest Park should be leased for the term of four years, commencing January 1, 1880, for use as a restaurant and for the sale of refreshments. The lease was to be executed by the board of public improvements, to the highest bidder, for said privilege. Under this ordinance and ordinance number 11271, approved January 21, 1880, amendatory thereof, "and by virtue of the authority vested in said board by the charter and general ordinances of the city," the board awarded to George D. Rilling the lease of the cottage and outbuildings for use as a restaurant, and for the sale of refreshments, at a rental of $1,850 per annum, for a period of four years, from January 1, 1880. In December of the same year the lessee made an assignment of his lease and privileges to C. W. Herbert. Subsequently, ordinance number 11160 was repealed by the adoption of ordinance number 12650, approved December 22, 1883; and on March 11, 1885, an ordinance numbered 13217 was approved, whereby the mayor, comptroller and park commissioner of the city were "authorized and directed to lease to Charles Schweickardt, for a term of six years, from the first day of April, 1885, the cottage and all outbuildings connected therewith, and the exclusive right for the sale of refreshments, as sold under a dramshop license, in Forest Park," at a rental of $1,650 per annum for the first two years, $1,750 for the next two years, and $1,850 for the last two years of the term. The lease was accordingly made. According to the stipulation

filed in this case, the lessee above mentioned entered into the possession of the said cottage and premises, and ever since (and to the present time) has kept a saloon on and about said premises, and has sold liquors in and about the same every day of the week, including Sundays; and most of the business has been, and is now being done, on Sundays.

The above quotations show that this case is brought strictly within the proviso aforesaid; so that it will readily be seen that the contention, based on the invalidity of the principal ordinance, must be for naught held; unless upon grounds other than those already stated.

III.    Under the constitutional provisions already referred to, a scheme and charter were in due time adopted, and went into effect on October 22, 1876. Several provisions of the scheme and charter, so framed and adopted, must be considered in determining this case.    These provisions are the following: By section 10 of the scheme, all the public buildings, institutions, public parks, and property of every character and description theretofore owned and controlled by the county of St. Louis, within the limits of the city as extended, were transferred and made over to the city; and all the right, title and interest of the county of St. Louis, in said property, was vested in the city; and it was further provided that the municipal assembly should, as soon as practicable after the adoption of the scheme and charter, provide by ordinance for the management "of said property."

Article 1, section 1, of the charter defining the corporate powers of the city, among other things provides that it "*may sell, lease or otherwise dispose of* any property for the benefit of the city."

By article 3, section 26, the mayor and assembly are empowered, "within the city, by ordinance, not

inconsistent with the constitution or any law of the state, or of this charter," to do certain things, among which are: *Third.* \* \* \* "To inclose, improve, regulate or sell all parks and other public grounds belonging to the city."

By article 4, section 3, it is made the duty of the mayor to appoint, as a member of the board of public improvements, a park commissioner. His duties are defined by section 39 of article 4 as follows: "The park commissioner shall have under his special charge and control all the public parks and places and squares of the city, excepting such as are by this charter, or by their dedication or other special provisions in the nature of a contract, excluded from the control of the city."

Article 8 of the charter provides that "the public parks" shall be under the supervision and control of the park commissioner. By section 2 of this article it is made his duty to execute all ordinances of the city regulating the management and improvement of the public parks.

Section 4 of this article is as follows: "The municipal assembly shall have authority, upon the recommendation of the board of public improvements, to provide, by ordinance, for the sale or lease of any of the parks, places and squares under the supervision of said board; but such ordinance shall provide that the proceeds of the sale of any such park, place or square shall be paid to the fund commissioners of the city, and that all rentals shall be placed to the credit of the board of public improvements for the improvement and embellishment of the parks of the city; *provided, however,* that no such sale or lease shall be made by the municipal assembly unless the ordinances providing therefor be submitted to a vote of the qualified voters

of the city for ratification at a general election, and it be ratified by a majority of the qualified voters of the city."

Section 6 of this article declares that the act of March 24, 1874, to establish Forest Park, etc., is thereby repealed. By the act just cited the park itself was established "for the people of the county of St. Louis," its boundaries were fixed, and the county court of St. Louis county was required, without delay, to acquire by purchase or condemnation the lands embraced within these boundaries. The fee of the property acquired by purchase, as well as that acquired by condemnation, was to be vested in the people of St. Louis county forever. Section 7 of this act provided for the appointment of "a board of Forest Park commissioners," to be composed of seven members. This board, the act declares, "shall have power to lay off, improve, adorn and generally govern, manage and control the use of said park and the avenues surrounding the same, and to this end shall appoint and discharge all officers and agents, prescribe their powers and duties, make agreements, rules and regulations therefor."

This act was held constitutional by this court in *County Court v. Griswold*, 58 Mo. 175. The foregoing is thought to be a sufficiently full and accurate statement of the establishment and government of Forest Park, and of the various legislative measures concerning it. It cannot be doubted, from this summary of legislation, that the absolute property in the park has been vested in the city, and that ample power has been conferred upon the municipal authorities to deal with the property thus bought and paid for; a power limited alone by boundaries established by the constitution of the state, or by statutory enactments. Subject only to those conditions, the power conferred

upon the city to deal with the park is plenary in its character. The charter, the organic law of the city, says the municipal authorities "may sell, lease or otherwise dispose of any property for the benefit of the city;" that they may "inclose, improve, *regulate* or sell all parks and other public grounds belonging to the city." Touching on similar provisions in the constitu- . tion of the United States conferring upon congress the power "to regulate commerce with foreign nations," etc., Chief Justice MARSHALL said.: "It is the power to regulate, that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution." *Gibbons v. Ogden*, 9 Wheat. 196. That case was approvingly followed in *State ex rel. v. Thomas*, 102 Mo. 85, in construing paragraph 8 of the same section and article (sec. 26, art. 3), which says the "mayor and assembly shall have power * * * to regulate and provide for the election or appointment of city officers required by this charter."

But it is urged that the litigated ordinance is invalid, for the reason that it authorizes a "*lease*" of the park to the defendant Schweickardt, in violation of section 4 of article 8 of the charter, which requires that "no such sale or lease shall be made by the municipal assembly unless the ordinance providing therefor be submitted to a vote of the qualified voters of the city for ratification at a general election, and it be ratified by a majority of the qualified voters of the city."

But the contract in question though it "*leases* to Charles Schweickardt the property, buildings and privileges mentioned in said ordinance," and though Schweickardt in the ordinance is termed a "*lessee*,"

yet it is evident from the first section of the ordinance, and from the whole history of the park, the legislation concerning it, and the usages which had grown up respecting the management and government of the park—indeed, from the *necessities of the case*—that the instrument in question did not have, and was not intended to have, the force and effect of a *technical lease*, and, therefore, is not obnoxious to the charge of violating section 4 of article 8 aforesaid, and this point will be made more prominently apparent in the following paragraph.

IV.   A park is variously defined to be "a pleasure ground in or near a city set apart for the recreation of the public;" "a piece of ground inclosed for purposes of pleasure, exercise, amusement or ornament" (*Perrin v. Railroad*, 36 N. Y. 120); "a place for the resort of the public for recreation, air and light  *  *  * a place open for everyone." *Price v. Inhabitants*, 40 N. J. L. 613. With these approved definitions and with the power to "*regulate*  *  *  * all parks *  *  * belonging to the city," it doubtless fell strictly within the legitimate and expressly given power of the municipality to provide rules for the management and government of the park, and among them to secure the services of some one who should provide for the comfort of those who should visit the park, for the purpose of enjoying the recreations incident to such localities.   This could be accomplished in the way already discussed or in some other mode; but in no case could the *mere method* of securing the labor of a public caterer be termed a lease of the park in any proper sense of that term.   It seems, too, to be a matter of common knowledge that refreshments, both solid and liquid, refreshments of an intoxicating nature, are customarily served to the visitors of the great parks of this country, Central Park, New York; Fairmount Park,

Philadelphia, and Golden Gate Park in San. Francisco.  On this basis of fact and of custom it cannot be regarded as any diversion of the legitimate uses of the park to have refreshments served in the manner contemplated by the ordinance and contract aforesaid. A park of the dimensions of the one in question, situate some four and one-half miles from a great metropolis of half a million of people—a park containing a territorial area of some thirteen hundred and seventy-four acres, must be regarded as a *little world in and of itself;* one in which should be exhibited the same degree of charitable forbearance and toleration of the tastes and habits of others as is required in the larger world of current life.  And so long as the proprieties of life are observed no one of the throng who visit such a locality has any grounds to insist that *his* method of conducting a park should be adopted instead of the plan deemed best by the regularly constituted authorities.  Such intolerance on whatever motives based is at war with the theory and practice of our government and an enlightened civilization.  Its voice should not prevail in a court of justice.  And, in this connection, it should be constantly borne in mind that within the legitimate sphere of their authority the discretion confided to municipal corporations is as proportionately wide as is a like discretion possessed by the government of the state, and as free from outside interference; and that discretion is not subject to judicial revision or reversal. *St. Louis v. McCoy,* 18 Mo. 238; *St. Louis v. Boffinger,* 19 Mo. 15; *Taylor v. Carondelet,* 22 Mo. 105; *Ferrenbach v. Turner,* 86 Mo. 416; *Gas Co. v. Des Moines,* 44 Iowa, 505.

And it must also be borne in mind when considering the point in hand and the force and effect of ordinance 16002, that, in relation to the property in question and the discretionary control of the city over

it, it must be regarded as a matter of *purely local concern*, as held and owned by the city not in its *political or governmental* capacity, *but, in* a *quasi* private *capacity* in which the municipial authorities act for the *exclusive* benefit of the corporation whose interests they represent. This position is abundantly sustained by authority as shown by briefs of counsel.

On the point of the different capacities in which municipal corporations may act, an eminent jurist and author observes: "They may be endowed with peculiar powers and capacities for the benefit and convenience of their own citizens, and in the exercise of which they seem not to differ in any substantial degree from the *private* corporations which the state charters. They have thus their public or political character, in which they exercise a part of the sovereign power of the state for governmental purposes, and they have their private character, in which, for the benefit or convenience of their own citizens, they exercise powers not of a governmental nature, and in which the state at large has only an incidental concern, as it may have with the action of private corporations. It may not be possible to draw the exact line between the two, but provisions for local conveniences for the citizens, like water, light, public grounds for recreation, and the like, are manifestly matters which are not provided for by municipal corporations in their political or governmental capacity, but in that *quasi* private capacity in which they act for the benefit of their corporators exclusively. In their public, political capacity, they have no discretion but to act as the state which has created them shall, within constitutional limits, command, and the good government of the state requires that the power should at all times be ample to compel obedience, and that it should be capable of being promptly and efficiently exercised. In the capacity in which they act for the benefit of

their corporators merely, there would seem to be no sufficient reason for a power in the state to make them move and act at its will, any more than in the case of any private corporation.     With ample authority in the state to mould, measure and limit their powers at discretion, and to prevent any abuse thereof, , their action within the prescribed limits, in matters of importance to themselves only, it would naturally be supposed, should be left to the judgment of their citizens and of their chosen officers.'' Cooley on Taxation [2 Ed.] 688, 689.

V. For reasons already given it is not thought that section 1 of article 2 of the revised ordinance of St. Louis, defining a saloon keeper, and requiring him to take out a license, etc., applies to this case; but only to such portions of the city in which such licenses are usually granted; and, further, if that section does apply then that the contract in question is a sufficient license under that section.

VI. But it is urged that the ordinance in controversy is void because it violates section 15, article 2,, of the constitution, viz.: ''That no *ex post facto* law;. nor law impairing the obligation of contracts or retrospective in its operation, or making any irrevocable grant of special privileges or immunities, can be passed by the general assembly.''

And that such ordinance also violates clauses 1 and 27 of section 53 of article 4 of that instrument, viz.: ''The general assembly shall not pass any local or special law [clause 1],    *    *    *    granting to any corporation, association or individual any special or exclusive right, privilege or immunity    *    *    * '' [clause 27].

It will be observed of these sections, that they are directed against the doing of certain things by the

"*general assembly,*" and not against the action of any municipal body. The assumption may be made that they apply to other legislative bodies than that body which makes laws for the state, and yet it is not sure that the ordinance in question creates a monopoly or special privileges within the meaning of the constitutional prohibitions. For the good government of the park, the maintaining order therein and the supplying of needed and customary refreshments to the frequenters of the park, it became a matter of necessity that some one should be authoritatively designated to supply such needs; otherwise, confusion and disorder would result. Of course the number to do this must be limited, and it belonged to the governing power of the park thus to limit it; and the exercise of that discretion is final. On this point Cooley says: "There are unquestionably cases in which the state may grant privileges to specified individuals without violating any constitutional principle, because, from the nature of the case, it is impossible they should be possessed and enjoyed by all; and if it is important that they should exist the proper state authority must be left to select the grantees." Cooley's Constitutional Limitations [3 Ed.] 394.

If the ordinance under discussion is void on the ground suggested, it must be confessed that many ordinances of similar nature, for cleaning the streets, for the removal of slops or of dead animals, hitherto thought valid, would in effect be expunged.

VII. Much has been said about the sale of intoxicating liquors *on Sunday*. These sales according to the stipulation filed have been going on for about *eleven years*, and yet no scenes of drunkenness or disorder are charged in the petition, which doubtless would have been done, had there been a sufficient basis of fact on which to rest such an allegation. On the contrary,

notwithstanding the sale of liquors, etc., has been going on for the length of time mentioned, the petition informs us that "*the number of visitors is yearly increasing at a prodigious rate.*" This concession certainly argues strongly in favor of the general commendation of the wisdom of the municipal authorities in this regard. But in no event can the sale of wines, etc., on Sunday be laid at the door of the assailed ordinance, because *no permission* therein to sell on that day is given. If the manager of the refreshment stands violates the law on this point he becomes guilty of a misdemeanor and can doubtless be punished; but certainly the fact that he is thus guilty affords no ground whatever for coming into a court of equity and asking for an injunction to restrain the *commission of crime.*

On this subject an author of recognized authority says: "The subject-matter of the jurisdiction of equity being the protection of private property and of civil rights, courts of equity will not interfere for the punishment or prevention of merely *criminal* or *immoral* acts, *unconnected with violations of private* right. Equity has no jurisdiction to restrain the commission of crimes, or to enforce moral obligations and the performance of moral duties; nor will it interfere for the prevention of an illegal act merely because it is illegal. And in the absence of an *injury to property rights* it will not lend its aid by injunction to restrain the violation of public or penal statutes, or the commission of immoral and illegal acts. 1 High on Injunctions [3 Ed.] sec. 20.

This point is well illustrated in *Attorney General v. Ins. Co.*, 2 Johns. Ch. 371. " The information filed in this case by the attorney general *ex officio* sought to restrain the defendant, a company incorporated for transacting the business of fire and marine insurance, from engaging in banking operations without authority in its act of incorporation, and in *direct violation* of

a *public statute* prohibiting unincorporated banking associations. KENT, after suggesting that the question involved was purely a *legal question*, the charge partaking of the nature of a *criminal offense*, observes as follows: 'If a charge be of a criminal nature, or an offense against the public, and does not touch the enjoyment of property, it ought not to be brought within the direct jurisdiction of this court, which was intended to deal only in matters of civil right resting in equity, or where the remedy at law was not sufficiently adequate. Nor ought the process of injunction to be applied but with the utmost caution. It is the strong arm of the court, and, to render its operation benign and useful, it must be exercised with great discretion, and when necessity requires it. Assuming the charges in the information to be true, it does not appear to me that the banking power in this case, produces such imminent and great mischief to the community as to call for this summary remedy. * * * If the defendants are carrying on banking operations contrary to law, they ought, undoubtedly, to be restrained; but I cannot be of opinion that the operation is such a mischief or public nuisance as to require the immediate and extraordinary process of this court to abate it. I know that the court is in the practice of restraining private nuisances to property, and of quieting persons in the enjoyment of private right; but it is an extremely rare case, and may be considered, if it ever happened, as an anomaly for a court of equity to interfere at all, and, much less, preliminarily, by injunction, to put down a *public* nuisance which did not violate the rights of property, but only contravened the general policy.' "

Similar views were expressed in *Sparhawk v. Railroad*, 54 Pa. St. 401. " This was a bill filed by pewholders in churches and owners of dwelling-houses

along the line of defendant's street railway to restrain the running of cars on Sunday.   The bill charged that, by reason of defendants running their cars on Sunday, complainants 'have been, and are and will be, deprived of their right of enjoying the Sabbath as a day of rest and religious exercise, free of all disturbance from merely unnecessary and unauthorized worldly employ- ment.' * * * The injunction was denied, THOMPSON, J., saying: 'It seems to me that this is clearly but a charge of the violation of the provisions of the act of assembly of 1794, which interdicts worldly employ- ment on the Sabbath day, and that it describes nothing but the consequences which are intended to be pre- vented by that act.   If this be so, then it is not a case of special injury, but only that which results from a public offense or wrong to all and every one in the community alike, where the act is committed.   * * * Rest and quiet on the Sabbath day, with the right and privilege of public and private worship, undisturbed by any mere worldly employment, are exactly what the statute was passed to protect.   10 Casey, 393.   The deprivation of these privileges is the sum of the com- plaint, and this bill is essentially, therefore, a bill to enforce, by injunction, a penal statute.' "

And the learned author, already quoted, cites *Attorney General v. Railroads*, 35 Wis. 425, which asserts the doctrine that the supreme court of that state will entertain an information filed on behalf of the attorney general to restrain corporations from an excess or abuse of their corporate franchises or from a violation of a public law to the detriment or injury of the public, as "the only precedent for the interference of equity to enforce, by injunction, obedience to a penal statute," and says of that case that "it certainly extends the jurisdiction by injunction to a point unsus- tained either by principle or upon authority."   1 High

on Injunctions, p. 21, note. The authorities on this point are very industriously collated by THOMPSON, J., in *State ex rel. v. Uhrig,* 14 Mo. App. 413.

The cases instanced from our own reports were all cases either instituted by the proper officer *ex officio,* or by private individuals for the protection of some *property right;* they were not instituted to "put down some public nuisance which did not violate the rights of property, but only controvened the general policy." If such a proceeding as this can be upheld, either as to injunctive relief or as to obtaining a decree declaring null any ordinance which any one of the numerous cities of this state may enact to open or to close some blind alley, or to arrest some vagrant, or to remove some dead animal, or to correct some foul odor, then the time of the attorney general and of his subordinates will be very largely occupied; and the different circuit courts will speedily be thronged with such causes. I do not believe that the attorney general has any authority to maintain this petition, and that it was properly dismissed as well on this ground as on those already statad.

VIII. The attorney general has no authority to institute or maintain such a proceeding as was instituted in the present case, and his petition was therefore properly dismissed on the ground stated as well as on the former ones. BLACK, J., concurs in all that is said. BRACE, J., in all but paragraph 5; BARCLAY, J., absent.