FREDERICK HEGER ET AL. v. CITY OF ST. LOUIS ET AL., Appellants.— 20 S. W. (2d) 665.

Division Two, October 4, 1929.

*Julius T. Muench, F. G. Sebek* and *Richard S. Bull* for appellants.

*Marion C. Early* and *Ivon Lodge* for respondents.

COOLEY, C.—Suit for injunction in the Circuit Court of the City of St. Louis. Judgment for plaintiffs, granting permanent injunction as prayed, from which defendants appeal.

Defendants other than the city of St. Louis are members of and compose the Board of Commissioners of Tower Grove Park, a public park in said city. Plaintiffs respectively own and reside upon parcels of land in the immediate vicinity of the park and of the strip of ground hereinafter referred to, which was condemned and taken for an extension of the park.

Tower Grove Park was established by an act of the Legislature in 1867, entitled "An Act to create, establish and provide for the government of the Tower Grove Park of the City of St. Louis," and was to embrace originally such lands, within prescribed boundaries, as Mr. Henry Shaw might see fit to give for the purposes of a public park. Pursuant to such legislative act, Mr. Shaw conveyed to the city certain lands thereafter known as Tower Grove Park. For the purpose of extending the park, the city of St. Louis, in 1921, passed an ordinance providing for the acquisition by condemnation of a strip of ground referred to as the Payne tract, not included in the Shaw conveyance. This strip is approximately 900 feet long by 182 feet wide, abutting lengthwise, as we understand the record,

1034

upon the south side of Magnolia Avenue, and adjacent to the park south of it, and will thus extend and "round out" the park to Magnolia Avenue. The condemnation proceedings culminated in final judgment in May, 1926, vesting title to said strip of land, as stated in the pleadings, in the city of St. Louis, and providing that same should be held forever for public park purposes. In the condemnation proceedings special benefits were assessed ag'ainst the properties of plaintiffs, which have been paid.

Pursuant to the judgment in the condemnation proceedings the former owners of the condemned property surrendered possession thereof to the city, and it was taken over by the board of commissioners about August 20, 1926. This suit was begun September 4, 1926. There are three dwelling houses located upon the strip in question, all immediately south of and fronting on Magnolia Avenue, each lot having a frontage of about fifty feet. Two of the houses were erected five or six years prior to the filing of this suit at a cost of about $20,000 each. The other one is somewhat older, but a good substantial house. Until surrendered to defendants the two newer houses had been occupied by their owners. The older house had been occupied for some months by a Mrs. O'Hara as tenant of the owner. All other properties in the immediate vicinity were occupied by their owners, the neighborhood being a residential section of substantial homes.

Upon taking possession of the property the board of commissioners placed tenants in the two newer houses and arranged with Mrs. O'Hara to remain as their tenant in the house she then occupied, all on the basis of a verbal tenancy from month to month and at rentals aggregating $307 per month. It was this rental of the houses that led to the bringing of this action. Plaintiffs in their petition claim that defendant commissioners propose to rent the houses for an indefinite time to private persons for dwelling and boarding house purposes, to the exclusion of the public, and that they have taken no steps to raze the houses in order to convert the property to park purposes, by reason whereof plaintiffs and the citizens of St. Louis are being deprived of valuable rights; that plaintiffs have suffered damage in that the character of the neighborhood has been and will be cheapened and the value of their properties lessened by making rental property of these houses formerly occupied by owners; that such use of said houses deprives plaintiffs of the benefits of having a public park in close proximity to their homes, for which special benefits were assessed against their properties, and that such use by the commissioners of the property in question constitutes a fraud upon plaintiffs' rights and is an unauthorized and illegal use of said property, and a diversion thereof from the use for which it was condemned.

There was no evidence tending to show any fraudulent purpose or bad faith on the part of the commissioners. At the trial the only claim made by plaintiffs' counsel in regard to the charge of fraud was that since the property had been condemned for park purposes the renting of the houses to private persons for any length of time for dwelling or other private uses constituted a legal fraud. Some effort was made to show that Mrs. O'Hara conducted a boarding or rooming house in the building occupied by her, but the evidence does not justify a finding that such was the fact. She was visited by some relatives who stayed several days and while they were there the unusual number of persons seen going in and out of the premises gave rise to the mistaken idea that a rooming or boarding house was being kept. There was no complaint as to the tenants in the other two houses, nor as to the manner in which the properties were kept up. It was clearly shown by the evidence and was practically conceded that all the tenants are good, respectable people, and that since rented to them by the commissioners the premises are as well kept and present as sightly an appearance as when occupied by their owners. The only evidence tending to show that renting the houses to respectable tenants, assuming they were kept in good condition, would cheapen the neighborhood or affect property values, was that of one witness, a real estate dealer, who gave it as his opinion that "where an exclusively residence district owned by property owners is invaded by tenants or boarding houses or things of that character, it would have a tendency to decrease the value of the property." On cross-examination on this point he said that a permanent invasion of an exclusively residential district by tenants would have a tendency to keep prospective purchasers from buying in that district for exclusive homes, but that renting a house temporarily for six or eight months or a year to a responsible tenant who kept it in good condition would not be objectionable nor materially affect the neighborhood.

The evidence in support of plaintiffs' claim that the commissioners intended and threatened to rent the houses indefinitely consisted of the testimony of one of the plaintiffs that in a conversation with Mr. Hutchings, secretary of the board of commissioners, about August 1, "he asked me whether there would be any objection to the buildings staying there and then leasing them; that they needed the money, and that in eight or ten years they would have enough money to improve the whole park there. . . ." Witness told Hutchings that he and "his people" would object. Hutchings was not a member of the board, and the board had made no order regarding the properties. It had adjourned about June 10 for the summer, according to custom, to meet again at a stated date in October. There was no evidence that Mr. Hutchings was authorized to express any

1036

opinion for the board as to how long the houses would be rented, or that the board or any officer or member thereof had indicated a purpose so to rent the houses. In a letter introduced by plaintiffs, written by the treasurer of the board by direction of its president on August 28, to one of plaintiffs' attorneys, in response to a letter of said attorney, the treasurer states:

"The President of the Board of Commissioners of Tower Grove Park has referred to me your letter to Mr. Hutchings under date of August 21, 1926. I am very sure that your letter was written under a misapprehension as to the use being made of the three houses which have been condemned.

"The Board has not yet formulated a plan for converting the condemned property into a part of Tower Grove Park. The Board is in adjournment until October. Just how long it will take to formulate a plan and just when the Board will have money in its hands for carrying out the plan, I cannot say. This is a matter, however, which the Board will very seriously consider and will carry out when it has the means to do so.

"In the meantime it would be very poor business on the part of the Board not to make available any income bearing property it had pending the conversion of it to a permanent use. The present tenants of the houses hold simply under a month to month tenancy and the use which is being made of the property at the present time is a mere temporary use pending the determination of the matters above outlined. Under these circumstances I believe you will agree that the Commissioners have acted in the best interests of the public and without any prejudice to your clients.

"If there is any further information you care to have, I shall be very glad to have you take the matter up with me."

The above letter does not appear to have been answered.

Mr. Buder, vice-president of the board of commissioners, the president being absent, directed the secretary to rent the buildings, and the secretary, pursuant to such direction, made the arrangements with the tenants. Mr. Buder testified that he directed placing tenants in the houses to have them occupied and conserve the property until the board could determine what to do with them; that they might want to put one of their foremen in one of the houses or turn one house into a comfort station; that there had been complaints from people adjacent to the park about park visitors asking permission to use toilets and complaining that the board should establish such facilities in the park, and that he had these matters in mind when he directed that the houses be kept occupied until the board met in October and could determine what should be done with them; that the question of rental was not one of real moment, that it was a question

of keeping the property occupied so as to avoid destruction, rather than anything else, until the board met, and that it is being rented to keep it occupied.

As further explaining the purpose and attitude of the board, Mr. Bedell, a member of that body since about 1921, was permitted, over plaintiffs' objection that it was immaterial to any issue in the case, to answer this question: "What problem confronted the Board of Commissioners in regard to the development of Tower Grove Park, which came to a head in May, 1926?

"A. We, as Commissioners, had been spending a little money on the two-hundred and six-foot tract owned by the Shaw Board to keep it decent. We really had no jurisdiction of it. We have been trying many years to see if we couldn't get the city to acquire that two-hundred-foot strip. This came to a head last year and under arrangements made with the city of St. Louis, as the result of a lawsuit brought by the Shaw Board, the city of St. Louis purchased what is known as the two-hundred-foot strip for five hundred thousand dollars, under the terms of which they are to pay fifty thousand dollars a year to the Shaw Board for a period of ten years. That brought that strip under our jurisdiction for the first time as a development for park purposes. . . .

"We knew at that time that condemnation proceedings were pending for the acquirement of the Payne tract. This Payne property, the condemnation proceedings didn't come to a head or didn't really come under our jurisdiction, as a matter of fact, until August of this year. . . . As a board, we have been waiting until we acquired all of this property under our jurisdiction, for the purpose then of having a comprehensive survey made as to how the park can be best used for the public. That is what is confronting us now, for all this property has come under our jurisdiction in the past eighteen months. Now, until we know exactly what we can use the park as a whole for, we cannot determine what we can use any particular strip for, and we have to wait until this question is studied and thoroughly considered before we can lay any plan before the Board of Aldermen and before we can ask for an appropriation, and we have to have a plan to present to them before they can be asked to act. That was our problem; we have got to wait until we know what we can do."

Defendants claimed that the board was without funds to develop the condemned strip and would have to await an appropriation by the Board of Aldermen of St. Louis, which would not be available until the following year, as the appropriations for the current year had already been made and apportioned. Upon their offer to prove the lack of funds with which to develop the property at the time

it was taken over, plaintiffs objected that it was immaterial and the court sustained the objection and excluded the evidence.

The court found, aside from formal and undisputed facts, that after taking possession of the condemned. property "defendants rented said houses, together with all appurtenances thereto pertaining, to certain persons to be used and occupied for and as private residence purposes under a purported month-to-month tenancy and that all of said houses are now in the exclusive possession of said tenants; and the court doth further find that such action of the defendants in so renting to and turning over possession of said premises for private residence purposes is not a lawful or proper use of public park property," and thereupon entered judgment perpetually enjoining defendants from renting, leasing or attempting to rent or lease any of said houses or any portion of the condemned property to any person, etc., and from collecting or attempting to collect rent for the use of any thereof, and from using or permitting the use of any thereof "for any purpose whatsoever which will or might in any way interfere with the use of said premises as a public park."

The court did not find, and the evidence would not justify a finding, that the value of plaintiffs' properties had been or will likely be materially affected by such temporary rental of the houses as is shown. From a consideration of all the evidence it is apparent that the commissioners were acting in good faith and for what they deemed the best interests of the public. We think, also, that as testified in substance by two of them, their primary purpose in renting the houses was to preserve them until the board could determine whether, and if so, how, they could be used for park purposes and could formulate plans and procure funds to convert the condemned buildings to park uses, and that the renting was not intended to be permanent, but only for such time as might be necessary to make and arrange to carry out such plans; and that as a secondary purpose the commissioners deemed it wise and proper to make the houses produce revenue rather than be a source of expense. The question for our determination is, does such temporary application of the property to private use constitute an unlawful use thereof or a diversion of the property from the public use for which it was condemned.

No case has been called to our attention, nor have we been able to find any, that deals with the precise situation here presented. Respondents cite cases announcing the generally recognized principle that private property can be taken under the power of eminent domain only for public purposes and that when so taken it cannot be given over to private interests, and that property dedicated or condemned for a specific use cannot be diverted to another and different use

inconsistent with that for which it was acquired. None of these cases deal with a merely temporary renting or use of property pending the time it can be actually devoted to the use for which it was so acquired. For example, in Kansas City v. Hyde, 196 Mo. 498, 96 S. W. 201, it was sought to condemn land for a public street. The landowner contended and offered to prove that the real object of the proceeding was to establish the street for the purpose of permitting a private corporation to occupy it with switch tracks for its own benefit and practically to the exclusion of the public, and that the proceeding in effect was an effort to take property under the power of eminent domain, ostensibly for a public purpose, but in reality for the benefit of private interests—a thing that of course would be unlawful. It was held that the evidence should have been admitted. The decision does not aid in determining the question presented in this case.

In Salisbury Land & Improvement Co. v. Commonwealth, 215 Mass. 371, 102 N. E. 619, 46 L. R. A. (N. S.) 1196, a statute was held unconstitutional which authorized the condemnation of lands for a public reservation and the sale or leasing of any lands so taken that were not needed as a public reservation, not limiting the right to sell or lease to lands originally deemed necessary but which had ceased to be needed or usable for the public use. It was held that as to lands not needed for the public purpose the statute was unconstitutional, as authorizing the taking of private property for private use, and that since the invalid parts could not be separated from the valid the whole statute was void. Other cases cited by respondent are likewise cases in which the threatened diversion was of a permanent character, or cases stating in general terms, upon facts not analogous, that property dedicated or condemned for a specific public purpose cannot be devoted to another and different use or to private use.

This case does not involve a threatened permanent diversion, nor can it be claimed that there was an abandonment of the public use. Abandonment is not established by proof merely of a failure for the time to use the property nor of a temporary use of it not inconsistent with an intention to use it for the purpose for which it was taken. [4 McQuillan on Municipal Corporations (2 Ed.) sec. 1650.] The commissioners simply found themselves in possession of property which could not immediately be devoted to the use for which it had been condemned. The buildings were valuable and it was thought that some of them might be adapted to legitimate park uses. If not, some disposition might be made of them that would salvage more of their value than to wreck them. Some time was needed to formulate plans as well as to procure funds for the conversion of the newly-acquired property in harmony with the existing park of which

it was to form a part so that the whole might best serve the public and carry out the purpose for which it was established. It is not unreasonable that these matters should require some time and careful consideration by the board. In the meantime it would have been unwise to let the houses deteriorate by remaining vacant. To have them occupied by responsible tenants and thus cared for while at the same time, producing some revenue which inured to the benefit of the public, rather than allow them to remain vacant and depreciate in value or expend the public funds in employing a caretaker, was but the exercise of sound business judgment. We are not persuaded that such action is opposed to sound public policy.

While not directly in point, a somewhat analogous principle was considered in Davis v. Rockport, 213 Mass. 279, 100 N. E. 612, 43 L. R. A. (N. S.) 1139. The town held certain land for public purposes, but at the time covered by the acts under consideration there was no public use for which it was needed or to which it could be put, and it leased the land to private persons. The right to lease the property was one of the questions to be decided. In sustaining such right the court cited French v. Quincy, 3 Allen, 9, and Worden v. New Bedford, 131 Mass. 23, 41 Am. Rep. 185, in which the same court had upheld the right of a city to rent portions of its city hall when not needed for the time being for any public use and stated its conclusion as follows:

"It can make no difference that the portion let is a part of a building or of land. The principle upon which in each of these two cases the defendant was held is applicable here; and it may thus be stated in a general form. A municipality has the power to let for profit real estate held for public purposes, and not needed for the present for such a purpose. It is not compelled to let the property lie idle. While it may not expend money to go into business, it may lease the property on reasonable terms and receive the rents. If some minor expense is needed to make the property rentable, such for instance as for a new key, a new blind or new steps in the case of a building, or for suitable ways in the case of vacant land either by leveling the land or making plank walks, such expense within reasonable limits may be legally incurred.

"We see nothing *ultra vires* in the acts of the defendant. It either could allow the property to remain unused or it could let the same or any part thereof for profit."

The Maryland court of appeals, in Gottlieb-Knabe & Co. v. Macklin, 109 Md. 429, 71 Atl. 949, 31 L. R. A. (N. S.) 580, reviews authorities and reaches a similar conclusion respecting the right of a municipality to rent a portion or the whole of a public building when not needed for public purposes. In the note to the latter case as reported in 31 L. R. A. (N. S.) 580, the annotator says that "it seems to be generally

conceded that a municipal corporation having erected a building in good faith for municipal or public purposes has the right, when such building is no longer used by the municipality, or when parts of it are not needed for public use, or when at intervals the whole building is not so used, and when it does not interfere with its public use, to permit it to be used either gratuitously or for a compensation for private purposes.''

Cases from several jurisdictions sustaining the principle are collected in the note. While there appears to be some conflict in the decisions, we think the weight of authority sustains the above-quoted conclusion, absent some limitation of the power of the governing body by statutory restrictions.

In Bryant v. Logan, 56 W. Va. 141, 3 Am. & Eng. Ann. Cas. 1011, the city leased part of a public park to private persons to improve and use at times for training and running race horses, the city receiving an annual rental and reserving access at times to the public for riding and driving on the track. It was held that such lease was not an unlawful diversion of the park from its legitimate use. The Court of Civil Appeals of Texas, in Henrietta Country Club v. Jacobs, 269 S. W. 137, held valid a contract whereby the city leased to the country club two lakes and appurtenant land acquired and owned by the city for the purpose of erecting and maintaining thereon its water works system, granting to the lessee the exclusive right to occupy same, build boat and club houses, etc. It appeared that the purpose of the city was to have the premises cared for and policed to the end that a purer and more wholesome water supply for the city might be provided. The court said that the contract seemed to be in the nature of one providing for a caretaker whose duty it was to preserve and beautify the property and to enforce reasonable regulations to maintain the purity of the water, and so long as the city made no complaint in those respects no reason could be seen for holding the contract void.

The legislative act establishing Tower Grove Park provided that the park should be under the exclusive control and management of a board of commissioners having full and exclusive power to govern, manage, direct and control the park, to lay out and regulate the same, and that ''in regard to said park they shall possess all the power and authority which now is or which may hereafter be by law conferred upon or possessed by the corporation of St. Louis in respect to the public squares and places in said city.'' By its charter the city of St. Louis is given authority to acquire or receive and hold and to improve, sell, lease or otherwise dispose of property, real or personal, for the benefit of the city. [Art. I, sec. 1, Charter; State ex rel. Atty.-Gen. v. Schweickardt, 109 Mo. 496, 506, 19 S. W. 47.] In

1042

the Schweickardt case, in discussing and upholding the validity of an ordinance and contract providing for the serving of refreshments in Forest Park by Schweickardt and the use by him of certain park property for that purpose, the court said that in considering the ordinance and contract it must be borne in mind that in relation to the property in question and the discretionary control of the city over it, it must be regarded as a matter of local concern, as held and owned by the city, not in its political or governmental capacity, but in a quasi-private capacity in which the municipal authorities act for the exclusive benefit of the corporation whose interests they represent. The court also held in that case, after reviewing the statutory and charter provisions relative thereto, that the power of the municipal authorities to deal with the park property is limited alone by the Constitution or by statutory enactments. The powers conferred upon the city and board of commissioners in the instant case are no less comprehensive. We do not mean to hold, of course, that they could divert the property to private use or to a use inconsistent with that for which it was condemned, nor that they could lease it for private use indefinitely, nor for such term or in such manner as would preclude them from devoting it to the public use as promptly as possible. But we are of the opinion that the temporary rental of the property in question, under the circumstances shown, was not a diversion or an illegal use thereof, and that the city and board of commissioners should be permitted so to conserve and use these houses for such time, but only for such time, as may be reasonably necessary in the exercise of due diligence to make necessary provision for their disposal or conversion to legitimate park uses. Should there be for any reason failure or unreasonable delay in accomplishing such provision a court of equity has power to grant plaintiffs' appropriate relief.

It is suggested in briefs of counsel that this court can modify the decree if it is deemed too stringent. But we have not before us sufficient facts upon which to base a proper decree. Such facts were not developed at the trial and do not appear in the record, the case having been tried on a different theory. And we are not informed as to the present status or what, if anything, has been done since the trial by the park authorities toward converting the condemned property to park uses. The situation can be better handled in the circuit court where all the requisite facts can be developed upon a further hearing, in which the court can ascertain and determine what further time, if any, should reasonably be allowed defendants to convert the condemned property to park uses, the conditions, if any, that should be imposed if further time is allowed, and any other facts necessary to the proper disposition of the case, and where an appropriate decree may be entered in the light of such facts.

The judgment of the circuit court is reversed and the cause remanded to that court to be there proceeded with in accordance with the views herein expressed. *Davis* and *Henwood, CC.,* concur.

·PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.