NEW HARMONY MEMORIAL COMMISSION *v*. HARRIS

[No. 27,515. Filed October 17, 1941.]

74

*George N. Beamer,* Attorney General, and *Norman E. Duke,* Deputy Attorney General, for appellant.

*Paul H. Schmidt,* and *George R. Ranes,* both of Evansville, and *James A. Erwin,* of Mt. Vernon, for appellee.

SWAIM, J.—The appellee, Joe C. Harris, was a guest in the inn or hotel, known as "The Tavern," which was located in New Harmony, Indiana, and which was being operated by the appellant, The New Harmony Memorial Commission. While a guest in said hotel the appellee delivered to one Ola Reece, the commission's employee in charge of the hotel, the sum of, $212.00, for safekeeping over night. This was done pursuant to a sign in the hotel informing the guests that "all valuables, jewelry and money should be left at the desk for safekeeping." The employee failed to place the money in the hotel safe, but instead placed it in a clothes closet. During the night the money was stolen and the employee and the appellant refused to make good appellee's loss.

Appellee filed a complaint in two paragraphs against the appellant commission for recovery of said money.

The appellant's demurrer to each paragraph of the complaint was overruled. The appellant then filed answers of general denial to each paragraph of the complaint, and a third paragraph of answer denying the authority of the employee to accept the money for safekeeping, and alleging that the safe in the hotel office was in charge of the director of the commission and his secretary, neither of whom was requested by the appellee to deposit the money in said safe. The cause was submitted to the court for trial without the intervention of a jury. The court found for the appellee and rendered judgment against the appellant commission. Appellant's motion for new trial on the grounds that the decision was not sustained by sufficient evidence and was contrary to law was overruled and this appeal followed.

Counsel for both parties agree that "the whole of appellant's defense to this action reduces itself to the proposition that the New Harmony Memorial Commission had no authority granted to it to operate this hotel."

We shall, therefore, limit this opinion to the interpretation of the act creating the New Harmony Memorial Commission and the determination of the question as to whether said commission, in operating said hotel, was acting within the powers granted by said act.

The New Harmony Memorial Commission, as constituted at the time here in question, was created by Acts of 1939, ch. 135, p. 659. By § 4 of said act the commission was authorized ". . . to acquire and purchase all the various buildings and sites of every kind in and about New Harmony that it may deem essential to the completion of the New Harmony Memorial, or for any other purpose or use contemplated in this act. It shall also make all necessary restorations,

repairs and improvements that may be required in and about the buildings, and it may restore and erect such other structures as may be necessary and proper to carry out the provisions of this act, . . ."

In § 5 of the act the commission is expressly given further broad powers in these words, "The commission is empowered to attempt every form of experiment that it deems compatible with the establishment of the New Harmony Memorial, including the issuance of all suitable publications for that purpose."

Section 8 provides, "The commission shall adopt such rules and regulations as may be found necessary . . . (for) the management of the grounds, buildings, structures and premises under its control, and any other matter which may be found necessary and which is not inconsistent with the provisions of this act." In § 26 the commission is expressly authorized to purchase personal property such as furniture and fixtures "and such other properties as may be necessary to establish the memorial as a going concern, including the maintenance of a radio station, if such proves feasible." This section also provides that the commission may establish a system of admission charges for individual units as fast as they are completed.

Further enlightenment on the general purpose of the act and on the powers of the commission is given by the recital of the duties of the director which the commission is directed to employ. Section 3 of the act provides as to such director that "It shall be his duty to make diligent research and investigation into all available sources for information as to feasible means for restoring and furnishing buildings and other structures, together with instituting practices and programs connected therewith, and to initiate by and with the approval and support of the commission such plans

and projects as shall memorialize substantially the out-
standing ideals and customs promulgated by the Rap-
pites and Owenites in New Harmony in such manner
as shall reflect those great historic institutions most
faithfully and bring the fullest possible measure of
inspiration and benefit from the same to modern gen-
erations."

Section 5 of the act is on the programs and projects
to be carried out and provides:

"It shall be the duty of the director of the com-
mission, by and with the approval of the commis-
sion to institute programs and projects of an
educational, recreational, patriotic and cultural
nature such as may be found necessary and feas-
ible to restore the working system of the 'Adven-
ture in Happiness' of Robert Owen's 'New Moral
World,' such as: forums, lyceums, balls, festivals
and public astronomical observations; shell hunts
on the river, periodically conducted in memory of
Thomas Say, the master conchologist, and his
charming wife, Lucy Sistaire; geological expedi-
tions of a similar nature including the gradual
development of a great geological museum in mem-
ory of William Maclure, the Father of American
Geology, and of David Dale Owen, who made New
Harmony the main geological headquarters of the
United States; scientific, literary, historical, and
philosophical institutes in memory of Robert Owen
and his illustrious sons, Robert Dale Owen and
Richard Owen, and other eminent leaders of Owen-
ite days; Harvest Home Festivals and music feasts
of the Rappites; and every form of entertainment
and edification that characterized any phase of the
Owenite 'Adventure in Happiness.' Arrangements
may be made with one or more higher institutions
of learning in Indiana or with individual members
of faculties thereof for the most economical and
effective promotion of the uses and purposes of
this act; and the most favorable working relations
shall be cultivated at all times with public and
parochial schools of Indiana especially in the con-
duct of pilgrimage programs and all forms of his-

torical site recitals in New Harmony. Special emphasis may be laid upon classical music and cultural dancing and expert instructors may be employed, if necessary, to form and maintain thoroughly trained groups and special organizations for these purposes. Inducements shall be offered through the operation of the Boatload of Knowledge, and other craft, if necessary, to encourage a return to the Wabash river and its inviting banks for boating, swimming, and promenading as in Owenite days of the 'Adventure in Happiness.' The mention of specific exercises herein is not intended as mandatory, but merely suggestive, and is not meant to exclude others of a kindred nature that may be found adaptable to the uses and purposes of this act."

It seems clear that the Legislature had in mind the restoration and maintenance by the commission of enough of the buildings and institutions in New Harmony, and the revival of enough of their early customs so that those of modern generations visiting New Harmony, might see and appreciate the community and its life as they existed in the days of the Owenites and Rappites. The success of the project was dependent on people from other parts of the state visiting in New Harmony, Indiana, and spending there sufficient time to see and study the institutions and customs of those early settlers. In order for people from a distance to do this it was necessary that hotel accommodations be available.

On the question of authority of the commission to operate the hotel we find an analogous situation in the operation of restaurants, hotels, and other similar conveniences in public parks. Many cases hold that the furnishing of such conveniences is a reasonable and valid exercise of the general powers of those responsible for operating public parks and is not inconsistent with park purposes. McQuillen Municipal Corporations, 2d.

Ed., § 1258. In *Gushee* v. *City of New York* (1899), 56 N. Y. Supp. 1002, 58 N. Y. Supp. 967, 970, it was held that the department of public parks was authorized, under its powers "to control and manage the parks," to lease to an individual a building in one of its parks for the purpose of operating therein a hotel and restaurant, the court saying, "The department of parks acted, in making this agreement, in the exercise of the power given to it by the legislature to control and manage the parks. The building in question was the private property of the city. It was proper that it should be utilized for the purpose for which it was used, if, indeed, it were not actually erected for that purpose by the city authorities. That, in the control and management of the public parks of a great city, it is perfectly proper to furnish not only such innocent amusements as may enhance the pleasure of those who resort to the parks, but such opportunities for rest and refreshment for themselves and their animals as may be required, will not be disputed."

In *State ex rel. Wood, Attorney General* v. *Schweickardt, et al.* (1891), 109 Mo. 496, 510, the court, after defining parks said, "With these approved definitions and with the power to '*regulate* . . . all parks . . . belonging to the city,' it doubtless fell strictly within the legitimate and expressly given power of the municipality to provide rules for the management and government of the park, and among them to secure the services of some one who should provide for the comfort of those who should visit the park, for the purpose of enjoying the recreations incident to such localities."

In *Bailey* v. *City of Topeka* (1916), 97 Kan. 327, 154 P. 1014, L. R. A. 1916D, 491, the City of Topeka accepted a tract of land to be used as a public park.

The Supreme Court of Kansas decided that the city was acting within its powers and within the terms of the dedication in granting to an individual exclusive rights to operate refreshment and lunch stands, and to rent boats and provide suits, towels, and rooms for bathers, at fixed prices, the court saying, "Clearly it is not inconsistent with the conditions imposed by the donor of the property that visitors to the park should be afforded facilities for obtaining refreshments, for boating and for bathing. No reason exists why they should not pay a fair price for what they eat or drink, or for the boating or bathing equipment they use. *The city might through its employees furnish these conveniences directly, collecting reasonable charges therefor.* The fact that a profit resulted would not render the transaction objectionable." (Our italics.)

As stated in the above quotation, since the furnishing of such accommodations is within the general powers of a park department and a building in a public park may be rented for that purpose, there is no reason why the accommodations might not be furnished by the municipality itself through its employees.

Hotel accommodations are provided for the visitors to our state parks under authority of the general powers of the Department of Conservation "to have the care, custody and control of such parks."

In the instant case the commission was expressly given every power necessary to establish the memorial and to bring it to the attention of the people of the State of Indiana. We fail to see how it could be said to be inconsistent with the general purpose of the act for the commission to provide convenient hotel accommodations for the benefit of the persons coming to New Harmony, to secure the benefits provided by

the memorial. We can see no distinction between furnishing hotel accommodations in a state park and to the visitors at a state memorial of this type.

The commission here was probably acting within its general powers in operating this hotel for another reason. The commission purchased "The Tavern" in June, 1941. It was apparently one of the old original buildings which was to become a part of the permanent memorial. At that time it was being operated by its owner as a hotel and the appellee was a guest therein, paying for his room by the week. There was considerable delay, because of legal difficulties, in closing the purchase. The evidence does not disclose the date of the actual transfer of the title to the property to the State.

The appellant does not contend that the purchase of the property as a part of the memorial project was not a proper exercise of the general powers of the commission. The question then arises, if the commission was acting within the scope of its authority in purchasing the hotel and was not just then in a position to restore and utilize the building as a part of the memorial project, could it be temporarily leased to an individual for private use?

In § 24 of the act we find what appears to be the expressed intention of the General Assembly that the commission should either sell or lease such buildings and other salable property situated on the lands acquired as they were not able to use. Said section provides as follows: "The commission is hereby authorized to sell any buildings, improvements or other salable property situated on any of the lands acquired under the provisions of this act, and to cover the proceeds derived from such sale into the New Harmony Memorial Fund. Any money which may accrue from the lease or

rental of any buildings, land or other property shall be added to the New Harmony Memorial Fund."

Even without such express authority as found in § 24 it has been held that a municipality may lease to an individual, for private use, property acquired for park purposes but which the municipality is not presently able to utilize for such purposes. *Heger* v. *St. Louis* (1929), 323 Mo. 1031, 20 S. W. (2d) 665.

If the commission was authorized by the act to lease the building as a whole, is it not reasonable to assume that it was authorized to lease a part of it? There was no language in the act limiting such use to an entire building as a unit. The apparent purpose behind said § 24 was that in establishing the memorial there should not be an unnecessary waste; that the buildings and improvements should be utilized in so far as such use was not inconsistent with the purpose of the general project.

The commission, after it acquired "The Tavern," continued to rent rooms by the week to the appellee and other guests. The commission, through its agent, Ola Reece, continued to operate the building as a hotel and to collect rent for the rooms from the appellee and the other guests. We believe that such temporary utilization of the property by the commission was within the powers of the commission.

Therefore, we are of the opinion that whether the operation of "The Tavern" as a hotel be considered to have been merely a temporary utilization of the property pending its repair and restoration as a part of the memorial project, or whether the operation of said hotel be considered as a permanent method of providing hotel accommodations to the visitors to the Memorial, such operation was within the powers of the commission.

The judgment is affirmed.

NOTE.—Reported in 36 N. E. (2d) 856.