State ex rel. Wabash Ry. Co. v. Publ. Serv. Commission.

THE STATE ex rel. WABASH RAILWAY COMPANY
and CHICAGO, ROCK ISLAND & PACIFIC RAIL-
ROAD COMPANY v. PUBLIC SERVICE COM-
MISSION et al., Appellants.

Division One, December 19, 1924.

1. **RAILROAD GRADE CROSSING**: Order of Commission: Conclusive-
ness. Unless it clearly appears from the evidence in the record
that the choice of the city's plan for eliminating a railroad grade
crossing at a named city street, by the ruling of a majority of the
members of the Public Service Commission, is unreasonable, un-
just or unlawful, it is the duty of the court, by the express com-
mand of the statute, to refuse to set aside or avoid its said order;
and the burden of proof that the order is clearly unreasonable, un-
just or unlawful is upon the railroad companies resisting it.

2. ———: Separation from Street Grade: Reasonableness: Danger:
Police Power. Where 1400 street cars carrying 33,000 passengers,
6,000 automobiles and other vehicles, 1,000 pedestrians, fifteen pas-
senger trains and six freight trains daily cross over a railroad
crossing at street grade, although there have been no great ac-
cidents and gates and watchmen are maintained, an order of the
Public Service Commission finding the crossing to be dangerous
and requiring a separation of the grade of the railroad from that
of the street, by the depression of the tracks and the construction
of a viaduct over them, at the joint expense of the city and com-
pany, is not an unreasonable exercise of the police power of the
State, which has a right to insist that a street crossing used by mul-
titudes of people, whose safety, is paramount to the rights of a
railroad, shall not be made dangerous to the traveling public, what-
ever may be the cost to the parties introducing the danger.

3. ———: Cost: Cheaper Plan. The difference in the cost of eliminat-
ing a grade railroad crossing by one of two proposed plans is not
a controlling consideration in considering the order of the Public
Service Commission approving the alleged costlier city plan, where
the railroad's estimates do not show that they were made with the
same degree of care that the city's were, and no other parties com-
plain. The railroad cannot vicariously complain for others, but it
is only if it is assessed more by the city plan approved by the com-
mission than it would have been justly assessed if its own plan had
been adopted that it can be heard to complain.

State ex rel. Wabash Ry. Co. v. Publ. Serv. Commission.

4. ———: Constitutional Power to Compel Change. The right of a railroad to occupy or cross public highways is dependent upon the condition that when such occupancy or use renders them dangerous to human life the State has plenary constitutional power to require the railroad to separate the grade of its tracks from the grade of the highway, and to require them to be elevated above or depressed beneath the grade of the highway, as the State may direct, and to impose the entire cost of the change upon the railroad.

5. ———: ———: Surrendered by Contract. The fact that the grade and location of railroad tracks through a public park were made pursuant to a contract between the park commissioners and the railroad company, or that said company leased its tracks to another railroad company, does not prevent the State from eliminating the dangerous railroad grade crossing at the expense of the company. The police power cannot be surrendered by contract or compromise, but all such contracts, as against the State, are void.

6. ———: Compensation: Æsthetic Taste. Private property—which includes the right of way, property, money and funds of railroads— cannot be appropriated for public use merely to please the eye or gratify the æsthetic tastes of the public or any part of it. But it is not clear that the order of the Public Service Commission in this case takes any railroad property merely to ornament or preserve the attractiveness and beauty of the neighborhood.

7. ———: Eliminating Defacement and Disfigurement of Residential District: Extra Expense Imposed on City: Statute. The entire expense of changing railroad tracks from the street grade at a crossing may be constitutionally imposed upon the railroad company; and where the order of the Public Service Commission imposes forty per cent of the cost upon the city, and that forty per cent reduces the actual cost to the railroad company to a sum less than would be imposed upon it if its own plan were adopted, it cannot complain that the plan approved was adopted to prevent the defacement and disfigurement of the neighborhood or to promote its attractiveness or beauty for residential purposes; it can justly complain only if the plan approved imposes on it a greater expense than its own plan. The statute, in authorizing the commission to require a city to pay a just and reasonable part of the expense of eliminating grade crossings, contemplated that controversies might arise in which the city might contend for a plan that would mar and disfigure the city less, but would be more expensive, than the plan proposed by the railroad; and in all such cases, if otherwise reasonable and just, the statute authorizes the commission to adopt a plan which imposes upon the city such portion of the cost as

State ex rel. Wabash Ry. Co. v. Publ. Serv. Commission.

fully meets the extra expense, and thereby reduce the defacement of the city to a minimum; and such statute is not for that reason unconstitutional, because it imposes no additional burden upon the railroad company.

8. ———: ———: ———: **Useful Public Purpose.** The Public Service Commission exercises one of its most beneficent functions when it reconciles the antagonisms between the public and railroads, by providing for the elimination of grade crossings in such manner as to mar and deface beautiful residential districts, and city parks, through which the railroad passes, as little as possible, by fixing the extra cost of preserving them from defacement and impairment, if any, upon the municipality.

9. ———: **Statutory Authority: Manner.** The statute (Sec. 10495, R. S. 1919) gives to the Public Service Commission power to determine the manner and plans of eliminating grade crossings, and to determine whether the elimination shall be by the elevation of the railroad tracks above the street grade or their depression under it.

10. ———: **Re-Location of Tracks.** The Public Service Commission has power to require the railroad company, as an incident to the elimination of a dangerous grade crossing, to remove its tracks, either onto the city's own adjacent land, or upon near-by land which the company can acquire only by condemnation; and if necessary to carry out a complete just and reasonable plan, the commission (under the statute, Sec. 10412, R. S. 1919) may require the company to exercise its power of condemnation.

11. ———: **Right Vested in Railroad: Section 9944: Repealed.** The right to determine whether, upon an order to eliminate a dangerous grade crossing, the railroad tracks shall be elevated above the street grade or placed under the street, is not by statute vested in the railroad corporation. The statute (Sec. 9944, R. S. 1919) declaring that a railroad corporation shall construct and maintain good and sufficient crossings where its railroad crosses public roads or town streets and "may make such road or street to pass under its said railroad where the same can be done with equal convenience and safety to the traveling public" purports to give the railroad company only the right to make the public road or street pass under its railroad, but in so far as it gives to any railroad corporation any authority to determine the manner of its tracks crossing a public road or street it was repealed by later Section 10459, Revised Statutes 1919, which clearly vests in the Public Service Commission the exclusive power to determine the manner in which all railroad crossings shall be constructed, including crossings where a separation of grades is ordered.

12. ———: Re-Location of Tracks: Compensation: Land Belonging to City: Park: Disfigurement. Where it becomes necessary, in carrying out a consistent plan for the separation of a railroad grade crossing from the level of the street, to re-locate the tracks at other crossings by placing them upon a city park or other land belonging to the city, the city can give a strip necessary for that purpose, and is entitled to have the value of such strip taken into account as a credit and as a part of the amount charged against the city in apportioning the expense, even where the percentage apportioned to the city is made in an intelligent effort to save the neighboring residential district and the park from disfigurement.

13. ———: Clearance: Trainmen on Cars. An eighteen-foot clearance between the railroad tracks and the viaduct above is not unreasonably small—it being sufficient to permit the highest engines and cars to freely and safely pass, and there being as a part of its unaltered track a near-by tunnel having a clearance of seventeen feet and three inches—although it may not be sufficient to allow employees to stand on top of the highest cars while they pass under the viaduct.

14. ———: Local Improvement: U. S. Transportation Act. The power of the State Public Service Commission to require a railroad company to pay the expense of lowering its tracks at a street crossing and of constructing a viaduct over them is not taken away by the U. S. Transportation Act, which prevents interstate carriers from issuing stock or bonds, or extending their main lines, without the approval of the Interstate Commerce Commission, where it is not alleged and the evidence does not show that the expense of eliminating the grade crossing is so great as to require an issue of stock or bonds of the railroad company, and no extension of its main line is proposed, and the proposed elimination is one of a local character and involves only the ordinary exercise of the police power of the State for public convenience and safety.

15. ———: Injury to Private Property: Damages. Whether the owners of private property adjoining the railroad right of way can legally recover damages for injury thereto caused by the depression of the tracks or their elevation at a street grade crossing, is not a question to be determined in a proceeding before the Public Service Commission, brought by the city against the railroad company, to compel a separation of the tracks from the street grade.

Appeal from Cole Circuit Court.—*Hon. Henry J. West-hues,* Judge.

REVERSED AND REMANDED (*with directions*).

L. H. *Breuer* and *Frank E. Atwood* for Public Service Commission; *George F. Haid* and *Oliver Senti* for Mayor and City.

(1) The Legislature may confer upon an administrative body powers that are not strictly and exclusively legislative. Pub. Serv. Comm. v. Railroad, 271 Mo. 258. (2) It was entirely competent for the Legislature to confer upon the Public Service Commission power to order the separation' of grade crossings. State ex rel. ᕽv. Pub. Serv. Comm., 272 Mo. 645. (3) The expense incurred incident to obedience to a regulation enacted for the public safety under the police powers is not a deprivation of private property without compensation. C. B. & Q. Ry. v. Drainage Commrs., 200 U. S. 593. (4) The commission is authorized to apportion the expenses incident to grade separations among the interested parties. State ex rel. v. Pub. Serv. Comm., 272 Mo. 645. (5) The approval by the commissioners of Forest Park of the grades at which the Wabash tracks were constructed does not prevent the alteration of those grades by the Public Service Commission. It is beyond the power of the State or a municipality to abrogate or limit by contract the right of the State to exercise its police powers in the preservation of the public safety. State ex rel. v. Pub. Serv. Comm., 271 Mo. 270. (6) Public service commissions may require the separation of highway and railway grades whenever, in the exercise of their sound discretion, the public safety may require the separation of such grades. It is not necessary that they defer the making of such an order until after an accident in which persons are killed or injured has occurred. Erie Railroad Co. v. Pub. Utility Commrs.,

254 U. S. 412. (7) The right of the State to impose a part of the cost of a grade separation upon a railroad company does not depend upon the railroad being thereby benefited. Erie Railroad Co. v. Pub. Utilities Commrs., 254 U. S. 394. (8) The burden of proving that an order of the Public Service Commission is unreasonable or unlawful is upon the party adverse to the commission or who is seeking to set the order aside. State ex rel. Harrisonville v. Pub. Serv. Comm., 291 Mo. 457; State ex rel. v. Pub. Serv. Comm., 271 Mo. 155. (9) The courts are not concerned with the expediency or wisdom of an order made by the Public Service Commission. If the power of the Commission has not been arbitrarily exercised and is supported by substantial evidence, the courts will accept it as final. State ex rel. Harrisonville v. Pub. Serv. Comm., 291 Mo. 457. (10) The power to determine whether a grade separation shall be accomplished by elevating or depressing the railroad tracks is lodged in the public authorities and not in the railroad company. American Tob. Co. v. St. Louis, 247 Mo. 474; State ex rel. v. Missouri Pacific, 262 Mo. 720.

*Homer Hall, Luther Burns* and *N. S. Brown* for respondents.

(1) The order of the commission was void and was properly reversed because the commission had no power or authority under the law to prescribe the manner of the separation under the provisions of Sec. 10459, R. S. 1919. (2) The order is void because the commission was without authority to make any order for the separation of grades at Delmar crossing for the reason that under the provisions of the Act of Congress approved February 28, 1920, entitled the Transportation Act of 1920, which amended the Interstate Commerce Act, the Public Service Commission was deprived of all jurisdiction and authority over the subject-matter of

this proceeding, and such jurisdiction and authority are exclusively vested in the Interstate Commerce Commission. Transportation Act of 1920, 41 Stat. L. 456; Shealy v. So. Railway Co., 120 S. E. 561; Atchison, Topeka & Santa Fe Ry. Co. v. Railroad Comm., 211 Pac. 460; State ex rel. N. Y. Cent. R. Co. v. Pub. Serv. Comm., 233 N. Y. 113; Lake Erie A. & W. R. Co. v. Pub. Utilities Comm., 141 N. E. 847; Pittsburgh & W. V. Ry. Co. v. Interstate Com. Comm., 293 Fed. 1001. (3) The Public Service Commission is a body unknown to the common law and not provided for in the Constitution of the State. It, therefore, has only naked statutory powers which must be expressly conferred upon it by the statute in order to give validity to its action. 2 Elliott on Railroads (2 Ed.) sec. 675; Wabash Railroad Co. v. Railroad Comm., 176 Ind. 438; State v. Atlantic Coast Line Railroad Co., 60 Fla. 465; Railroad Commissioners v. Oregon Railroad Co., 17 Ore. 65, 2 L. R. A. 195. (4) The power given the commission must be held within constitutional limitations. The railroad company's property may not be burdened with a use and public benefit foreign to its purpose and organization and its public duty, and the Public Service Commission has no power or authority to impose any such burden upon it. The commission is not a general manager of the railroad property. It can exercise only such powers as are expressly conferred upon it. State ex rel. v. Pub. Serv. Comm., 229 S. W. 785; State ex rel. v. Pub. Serv. Comm., 192 S. W. 962; Interstate Com. Comm. v. C., G. W. Ry. Co., 209 U. S. 118; Great Northern R. Co. v. Minnesota, 238 U. S. 340, 59 L. Ed. 1337; Chicago, M & St. P. R. Co. v. Wisconsin, 238 U. S. 491, 59 L. Ed. 1423; L. R. A. 1916A, 1133; Atchison, T. & S. F. Ry. Co. v. Railroad Comm., 173 Cal. 577. (5) The order of the Public Service Commission is illegal and void because it is not based upon a consideration of and is not necessary to secure the safety or convenience of the public or of railroad employees. The commission is limited in its jurisdiction to the question of the safety of the pub-

lic and the employees of the railroad. Sec. 10458, R. S. 1919. (6) The order of the commission cannot be sustained as an exercise of the police power of the State, for it is not based upon a consideration of public safety, health, good morals or good government. St. Louis Gunning Co. v. St. Louis, 235 Mo. 99; St. Louis v. Dreisoerner, 243 Mo. 223; 41. L. R. A. (N. S.) 177; St. Louis v. Evraiff, 256 S. W. 489; State ex rel. v. McKelvey, 256 S. W. 474; 5 R. C. L. 702. (7) Neither the city nor the Public Service Commission has the power under the law of eminent domain to force the separation of grades according to the city's plan. The right of eminent domain is conferred for a particular purpose, and when conferred it is to be treated as an invasion of the rights of the individual whose property is to be taken and therefore must be strictly construed. Chicago Railroad Co. v. McCooey, 273 Mo. 29; Light Co. v. Scheweich, 174 Mo. 241; Kansas City v. Marsh Oil Co., 140 Mo. 458; Western Union Co. v. Railroad, 195 U. S. 540, 570; American Tel. Co. v. Railroad, 202 Mo. 656; Jackson v. New York, 213 N. Y. 34; City of Waterbury v. Platt Bros., 76 Conn. 435. (8) The order is not based upon a consideration of the safety or the protection of the public or of railroad employees, but is based purely on an aesthetic consideration, which is beyond the powers of the commission, and therefore cannot be sustained. St. Louis v. Dreisoerner, 243 Mo. 223; State ex rel. v. McKelvey, 256 S. W. 475; St. Louis v. Evraiff, 256 S. W. 493; St. Louis Gunning Co. v. St. Louis, 235 Mo. 173.

SMALL, C.—This is an appeal by Henry W. Kiel, Mayor of the City of St. Louis, and by said city and certain intervening property owners, from a judgment of the Circuit Court of Cole County, setting aside an order of the Public Service Commission, abolishing the grade crossing of the Wabash Railroad over Delmar Boulevard, in said city.

The order set aside was made by a majority of the commission and required a viaduct, according to the City Plan, to be constructed in Delmar Boulevard, carrying said boulevard over the tracks of the railroad at said crossing. There was a dissenting opinion by Commissioner McIndoe, holding that the "Wabash Plan" of elevating the tracks of the railroad over the street at this crossing should be adopted. The majority opinion and order required the city of St. Louis to pay forty per cent, and the Wabash Railroad Company sixty per cent, of the cost of constructing said viaduct, and the street railway and other public utilities using said crossing to pay the expense of adjusting their facilities to the changed conditions. The order suggested by the dissenting commissioner and adopted by the circuit court was, that the city should pay twenty per cent of the cost of separating the grades according to the "Wabash Plan," and the street railway to pay five per cent of the cost of the subway at Delmar Boulevard—all other public utilities and industries affected to pay the cost of adjusting their facilities to the new conditions, and the Wabash Railroad Company to pay the balance of the expense.

The Wabash Railroad enters the city of St. Louis from the north and crosses the westerly line of the city limits at Maple Avenue. It then runs south and southeasterly in a somewhat irregular course to Kingshighway, a distance along the railroad of about three miles. Kingshighway runs north and south along the eastern line of Forest Park. In its course from Maple Avenue, an east and west street, which it crosses on grade, to Kingshighway, the railroad crosses, successively, on grade, Olive Street Road, Delmar Boulevard, Hamilton Avenue, Waterman Avenue, then De Baliviere Boulevard, where it crosses the tracks of the Rock Island Railway Company, which comes into St. Louis from the west. From De Baliviere Boulevard both roads adjoining each other run east approximately one-half mile,

where they cross Belt Avenue (or what was formerly Belt Avenue) and then continuing southeasterly nearly a quarter of a mile they cross Union Avenue near its junction with Lindell Boulevard, crossing Lindell Boulevard about fifty or one hundred feet southeast of Union Avenue. Lindell Boulevard runs east and west along the north boundary of Forest Park. All the other streets crossed run practically east and west at their intersection with the railroad tracks. Up to this point all said crossings are grade crossings. Leaving Lindell and proceeding southeasterly, the Rock Island uses the Wabash tracks through Forest Park into St. Louis Union Station. The Wabash tracks enter Forest Park where they cross Lindall Boulevard and run on an embankment and pass over Grand Drive in the Park on a bridge, about twenty feet above the roadway. They then run in a southeasterly direction through the Park, crossing a way for pedestrians on grade, to the east line of Forest Park, where they strike Kingshighway, which they pass under through a tunnel, having a clearance for trains of seventeen feet and three inches. The distance along the railroad through the Park is about three-quarters of a mile, and the bridge over the Grand Drive is about midway between Lindell Boulevard and Kingshighway. The Park itself is one of the principal—the largest and perhaps the most highly improved—park in the city. The whole district between Lindell and Delmar Boulevard through which the railroad runs—a distance of nearly a mile and a half—is a highly improved and beautiful residential district containing many very costly homes. North of Delmar Boulevard for perhaps two blocks on the east side of the tracks is also an attractive residence district, but north of these two blocks and on the west side of the tracks the railroad runs through an industrial district to the city limits. The entire section north of Forest Park to Delmar Boulevard, extending several miles east and west into University City, is thickly populated and is a most attractive residential part of the city.

The complainant alleged that on account of the heavy travel on Delmar Boulevard, which is one of the main thoroughfares running through the center of the city of St. Louis from east to west, and the number of trains operated over said crossing by the Wabash Railway Company, said grade crossing had become exceedingly dangerous for all travelers on the street, and praying that the grades should be separated by the construction of a substantial viaduct in said Boulevard over said tracks, the expense to be borne by all parties affected' thereby, in such proportion as the commissioner should prescribe.

The answer of the Wabash denied that public travel was such as to require any separation of grades at said crossing, averred that the construction of a viaduct in said avenue as requested by this proceeding was but a part of the "complete plan" of the city of St. Louis, already prepared, and would require numerous other grade crossings south of Delmar Boulevard to be abolished by requiring the railroads to depress their tracks under the streets, which would be wholly unreasonable and impracticable, and prevent the abolishing of such grade crossings in the future by an elevation of the tracks over the streets. That requiring the railroads to so depress their tracks as contemplated by the "complete plan" of the city, would violate the contract entered into between the Forest Park Commissioners and the Wabash Railroad's predecessor in title, by which, under authority of an Act of the Legislature of Missouri approved March 25, 1874, said railroad right of way was located and the grade thereof established through Forest Park in said city as it now exists; that said contract provided it should not be changed without the consent of all parties interested and that to do so would take and damage the railroad's property, without compensation and without due process of law, and violate the obligation of contracts contrary to the provisions of the State and Federal constitutions, and also abrogate the Wabash contract with the Rock Island for the use of its

tracks through Forest Park, from which the Wabash receives a rental of $2500 per month.

The answer of the Rock Island substantially agreed with that of the Wabash, setting up that the larger, or "complete plan" of the city, of which the present proceeding for a viaduct on Delmar Boulevard over the Wabash tracks was but a part, would necessitate the lowering of the Rock Island tracks from its connection with the Wabash tracks at Lindell Boulevard, and for some distance west thereof beyond De Baliviere Boulevard, and would be wholly unreasonable and impracticable.

The answer of the city of St. Louis admitted the allegations of the complaint and joined in the prayer thereof.

Certain property owners also intervened and supported the city in its contentions.

At the hearing, the Wabash Company presented a plan for raising the grade of its tracks at Delmar Boulevard and proposed that any separation of grades at grade crossings throughout the entire district should be by raising the railroad embankments and crossing over the streets, leaving the streets as they are, instead of as proposed by the plans of the city—that of depressing the tracks under the streets and constructing viaducts in the streets over the tracks. The Rock Island Railroad will not be directly affected by the present proceeding, which involves only the crossing at Delmar Boulevard. But it is indirectly affected in that the topography is such that if a viaduct is now constructed over the Wabash tracks in Delmar Boulevard, as proposed by the city, viaducts will have to be constructed in the streets and the railroad tracks be depressed so as to pass under the streets in order to abolish the other grade crossings where the Rock Island tracks are located. By amendment to the complaint this was admitted.

By the "City Plan" now before us, affecting the Delmar crossing only, the tracks of the Wabash are left at their present grade at Delmar Boulevard, and also at all other places. The city viaduct will be eighteen feet in the clear over the tracks. There are to be approaches thereto of earth embankments, with retaining walls. The grade of the approaches is two and one-half per cent and each is about 750 feet in length. The testimony of the city engineers was that the construction of the viaduct and approaches as proposed by complainant at Delmar Boulevard would be $466,900, and of a contractor, who testified for complainant, about $10,000 more. That the damages to private property by the change in the grade of streets caused by the construction of said approaches and viaduct would be $61,756.79, making a total cost of $528,000 to $538,000, in round numbers. The estimate of the witnesses for the Wabash for the same work was $958,000. In the Wabash estimate is included $57,000 for the relocation of Delmar Boulevard, during the construction of the approaches and viaduct. Also $184,000 for legal expenses and property damages. The railroad also estimated embankment to cost $1.10 per cubic yard, while the city allowed seventy cents. The railroad also figured $40,000 for "Barrow Pit," and $55,000 for expense of the telephone company in adjusting its poles, and $31,000 for the expense to the street railway for relaying its tracks. All these items the cited omitted from its estimate and criticizes as either too high or not proper items to be included.

The "Wabash Plan" for the Delmar crossing required the railroad to elevate its tracks at Delmar, twenty-one feet, which would require an elevation at the next street south, Hamilton Avenue, of twenty-two feet, with approaches beginning at De Baliviere Avenue, on the south, and at Olive Street Road on the north, said approaches having a grade of one per cent. This plan abolishes two grade crossings, the one at Delmar Boule-

306 Mo.—11

vard and the other at Hamilton Avenue. The estimate
of the Wabash of the cost of its plan is $670,000, which
exceeds the city's estimate of the cost of the city plan
for the overhead viaduct at Delmar by $131,000, but is
less than the railroad's estimate of the cost of that via-
duct by $287,000.

The city strenuously objects to the Wabash plan of
abolishing the grade crossing at Delmar Boulevard, be-
cause its embankment destroys the value of much pri-
vate property without recompense, by defacing the land-
scape, and because it requires the abolition of all other
grade crossings south of Delmar to Kingshighway to
be made by raising the railroad embankment for over a
mile through a most beautiful residential district from
Lindell north to Delmar Boulevard, which will mar the
beauty of said district and seriously decrease its value
without redress on the part of the property owners, as
well as obstruct their view of Forest Park, and mar
the beauty of Forest Park by destroying the attractive-
ness of the surrounding neighborhood and continuing
and increasing its present embankment in said Park.
There was much evidence by property owners and expert
real estate men sustaining this view.

The city's complete plan provides for a depression
of the railroad tracks all the way from Delmar Boule-
vard to Kingshighway through Forest Park so that the
cars will run in a cut and not be visible for the most
part, and there will be artistic viaducts and approaches
to such viaducts over the tracks where they cross the
streets. The viaducts will have a clearance of eighteen
feet above the tracks. The embankment on which the
railroad now runs through Forest Park will be removed,
and a depression in the right of way take its place. The
cut, or depression, will have sloping sides towards the
tracks, and sloping banks about seventeen feet high
away from them, which will be sodded and beautified
with shubbery and trees and thus practically hide the
railroad tracks and trains from view in a pleasant valley

or sunken garden. The bridge now over Grand Drive, which carries the railroad overhead above that Boulevard in the Park, will be taken down and a viaduct will be constructed in said Drive over the tracks below. North of Delmar, under the city plan, as well as the Wabash plan, the tracks will be elevated and run over the streets, to and beyond the city limits, but the embankment of the city plan is much less in height for some distance than that of the Wabash plan. The complete plan of the city also calls for a change in the location of the Wabash tracks in Forest Park between Kingshighway and Union and Lindell Boulevards, by moving them about fifty feet south of their present location until they approach the intersection of Union and Lindell Boulevards, where they would have to be moved one hundred fifty feet south. The Wabash right of way outside of Forest Park is from fifty-five to sixty feet wide, and within the Park is forty-two feet. The city owns title to two strips of ground twenty-two feet wide along the Wabash right of way north of the Park from Delmar to De Baliviere Boulevards, which, added to the present right of way of the Wabash, would make it one hundred feet wide between these points. Just west of Union near Lindell Boulevard, on the north line of the Park, it will be necessary to acquire additional land (less than one acre) to change the location of the tracks of both railroads at that point required by the city complete plan, but the city has an option on the necessary land. With this land of the city added to the present railroad right of way, there will be a right of way one hundred feet wide from Delmar Boulevard through Forest Park to Kingshighway, which will be sufficient for four tracks. At present the Wabash has but two tracks, and leases one track from the Rock Island outside, and north of the Park. Both the city plan and the Wabash plan contemplate four tracks. The city's estimate of the cost of its complete plan of abolishing all grade crossings south of Delmar Boulevard, as to the Wabash Rail-

road, was $1,840,000, and as estimated by the Wabash engineers for the same work, $3,000,000, but there are items contained in the railroad estimate which the city controverts and which, if eliminated, would reduce the railroad estimate to $2,000,000.

The track-elevation plan of the Wabash to abolish all said grade crossings would carry the tracks over all the streets, leave the streets and public utility facilities therein, and sewers undisturbed, and not affect private property except as the embankment it proposes damages it and obstructs the view and disfigures the beautiful residence' neighborhood and Park through which it would'pass. The tracks would be elevated about twenty-two feet above the surrounding property, but the proposed bridges over the streets would be ornamental and the slopes of the embankments sodded and beautified with shrubbery.

The Des Peres River, a small stream in dry weather, but doing considerable damage at flood tide, runs southeasterly in the vicinity of, and at several places quite near, the railroad, and much evidence in the record bears on the damage that river may do when it overflows, if the city plan or Wabash plan be adopted. But the majority opinion of the commission discards that testimony, and we think properly, as unimportant, because the city of St. Louis has voted bonds to build a public sewer in which to confine said stream, which practically eliminates it from the case.

The clearance of only eighteen feet for trains under the proposed viaducts of the city will not permit employees of the railroads to stand upon the top of the highest cars, and therefore there is danger of their being killed or injured while so doing. But Kingshighway tunnel, through which all Wabash and Rock Island' trains pass, has only a clearance for trains of 17.3 feet, and the St. Charles Road bridge on the Wabash practically the same clearance as the proposed city viaducts, to-wit, 18.4 feet. It is also shown in evidence that an eighteen-foot

clearance is quite common, although a clearance of more than eighteen feet is desirable, when feasible, by the railroads. In this case, however, the city plan does not admit of a greater clearance than eighteen feet, which the weight of the evidence shows is reasonable and practicable, especially in view of the clearance of 17.3 feet in the Kingshighway tunnel and 18.4 at St. Charles Road. The maximum grade of the railway tracks by the Wabash plan, at Delmar, is one per cent, while the city plan on Delmar does not disturb its present grade at any point. But the maximum grade of the tracks from Kingshighway to the city limits under the city complete plan is 0.8 per cent, while that of the Wabash plan is 0.44 per cent. But at a number of places on the present line of the Wabash and near St. Louis, the grade is one per cent, and the city grade of 0.8 per cent is reasonable and less than the present grade of the tracks affected. The proposed cut of the city may be troubled with seepage water, but this may be cared for by proper sewerage. Under the Wabash plan, the railroad bridges will have posts or pillars in the streets which will be dangerous to travelers in automobiles, and other vehicles, but respondents suggest this is not essential to such bridges, as they may be constructed so as to span the entire street without posts or pillars. There are also posts or supports of the city viaduct in the railroad right of way, but it is shown they are so far distant from the tracks (seven feet) that there is no danger of collision with them by the cars or employees of the railroads. The approaches to all the city viaducts for its complete plan embankment to be constructed by the Wabash plan, and are much less in height than the 10,900 feet of will total a length of 18,895 feet, but they start at zero which would be twenty to twenty-two feet high above the surrounding territory on an average, and would constitute a much greater disfigurement of the residential district than under the city plan.

The evidence of the city tends to show that the community would be much less annoyed by smoke and noise of trains by its plan than by the Wabash plan, but the evidence for the railroads is to the contrary. The Wabash plan would also perpetuate its grade crossing over the pedestrian way in the eastern part of the Park, which the city plan would establish. The city complete plan would only afford room for three tracks on the existing Wabash right of way, because of the space to be occupied by retaining walls made necessary by the city cut, whereas by the Wabash embankment plan it can carry four tracks by placing one on the top of the retaining wall which may be constructed to support its embankments. But it is shown that by the city plan the right of way is to be widened under favorable conditions, the city practically having nearly all the property necessary therefor, whereby it will more readily accommodate the four tracks proposed by the Wabash than by its own plan. So while, by the city plan, the grade of the intersection of Union and Lindell Avenues will be raised somewhat by the city viaduct, the "bump" in Hamilton Avenue will be perpetuated and the Jefferson monument obscured from view by the Wabash plan.

By the city complete plan also, the railroads will cross Lindell and Union Boulevards at their junction and thus abolish one crossing entirely, as the tracks now cross both Boulevards only about one hundred feet apart.

As to the Rock Island, the evidence shows that there is no substantial difference, in the cost—to it—between the city complete plan and the Wabash plan; that such difference in cost is not important, and that its chief engineer stated in writing that if the Rock Island continued the use of the Wabash tracks—which the evidence shows it may not do—it had no objection to the city plan.

There are other matters of minor importance bearing on the respective merits of the two plans, but the foregoing are all that need to be mentioned.

On the whole record we find in accordance with the

conclusions of the commissioners that so far as the railroads are concerned, either plan serves their purposes equally well, but that the Wabash plan would greatly injure said residential district and Park without redress, whereas the city plan reduces such injury to the minimum.

I.    Unless it clearly appears from the evidence in the record that the choice of the city plan for eliminating the grade crossing at Delmar Boulevard, by the ruling membership of the commission, is unreasonable, unjust, or unlawful, it is our duty, under the express command of the Public Service Act, to refuse to set aside or avoid said order, and the burden of proof that said order is so clearly unreasonable, unjust, or unlawful, is upon the respondent railroad Companies. [State ex rel. Case v. Public Service Commission (this court), 249 S. W. l. c. 960, and cases cited.] In State ex rel. Harrisonville v. Public Service Commission, 291 Mo. l. c. 457, we said: "We are not concerned with the expediency or wisdom of the order made. The findings of the commission are by statute made prima-facie lawful, and we will ascribe to them the strength due to a judgment of a tribunal created by the Legislature and informed by experience. While the conclusion reached is subject to review, nevertheless, if the power of the commission has not been arbitrarily exercised . . . and if the order made is not violative of the Constitution, or wanting in conformity to statutory authority, and is supported by substantial evidence, we accept it as final."

*Conclusiveness of Order.*

II.   As to the reasonableness of eliminating the grade crossing at Delmar Boulevard:  Both the majority and dissenting opinions of the commission agree that the said grade crossing is dangerous and should be eliminated. Fourteen hundred street cars, carrying 33,000 passengers, and 6000 automobiles and other vehicles, as well as 1000

*Reasonableness of Order.*

pedestrians, daily cross over said crossing, and each twenty-four hours fifteen passenger trains and six freight trains of the Wabash Railroad cross same. On one occasion a street car was struck by a train and some passengers injured and quite a number of minor accidents have occurred within the last five years. One of the Wabash experts testified that if the travel was as great as the testimony indicated, there would be a "strong probability of the necessity of eliminating that grade crossing." It is true that the Wabash Railroad maintains, and has for years maintained, gates and watchmen at said crossing and no great accidents have occurred. but all grade crossings are dangerous, and it is not unreasonable to separate the grades, at much-traveled crossings in cities, such as the one we have to consider, before any great accident occurs. In Erie Railroad Co. v. Public Utilities Commissioners, 254 U. S. 410-12, the court said:

"Grade crossings call for a necessary adjustment of two conflicting interests—that of the public using the streets and that of the railroads and the public using them. Generically the streets represent the most important interest of the two. There can be no doubt that they did when these railroads were laid out, or that the advent of automobiles has given them an additional claim to consideration. They always are the necessity of the whole public, which the railroads, vital as they are, hardly can be called to the same extent. Being places to which the public is invited and that it necessarily frequents, the State, in the care of which this interest is and from which, ultimately, the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. That is one of the most obvious cases of the police power, or to put the same proposition in another form, the authority of the railroads to project their moving masses across thoroughfares must be

taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires. . . .

"If we could see that the evidence plainly did not warrant a finding that the particular crossings were dangerous there might be room for the argument that the order was so unreasonable as to be void. The number of accidents shown was small and if we went upon that alone we well might hesitate. But the situation is one that always is dangerous. The board must be supposed to have known the locality and to have had an advantage similar to that of a judge who sees and hears the witnesses. The courts of the State have confirmed its judgment. The tribunals were not bound to await a collision that might cost the road a sum comparable to the cost of the charge. If they were reasonably warranted in their conclusion their judgment must stand."

We hold, therefore, that the public travel was such over the grade crossing at Delmar Boulevard as to make it dangerous, and it is reasonable that it should be abolished by a separation of the grade of the street from that of the railroad.

III. The principal reason given by the dissenting commissioner and the circuit court, as well as respondents here, why the Wabash plan in preference to the city plan of elimination should be adopted at Delmar, is that, by the Wabash plan, the grade crossing at both Delmar Boulevard and at Hamilton Avenue would be eliminated at a cost of $670,000, according to the Wabash Company's estimate, whereas the elimination of the grade crossing at Delmar alone, according to the city plan, would cost $538,000, according to the estimate of the city, and over $200,000 more than that according to the Wabash estimate. We do not think the greater cost is so excessive as to be the controlling consideration in this case and, besides, the estimates of the railroad do not impress us as having been made with the same care as that of the city.

*Costs.*

The representatives of the city, both before the commission and before us, stated that the city would guarantee the correctness of its figures, but no such offer was made by the railroads. The railroads cannot vicariously complain for others, and it is only if they are assessed more by the city plan than they would have been justly assessed by the Wabash plan, that they can be heard to question the cost. No other parties assessed appealed except the Wabash and the Rock Island.

IV. As to the constitutional objections raised by respondents:

(a) It cannot be longer doubted that a railroad holds its right and title to cross or occupy the public highways upon condition that when such occupancy or use renders them dangerous to human life, the State has plenary constitutional power to require the railroad to separate the grades and to go under or over the highways, as the State may direct, and impose the entire cost of so doing upon the railroad. [Erie Railroad Co. v. Board Public Utilities, 254 U. S. 394; State ex rel. v. Public Service Commission, 272 Mo. 650.]

It is said by the Supreme Court of the United States in Erie Railroad Co. v. Public Utilities Commission, 254 U. S. 410, the State or city representing the public, from which the railroads derive their right to occupy the streets, "has a constitutional right to insist that they shall not be made dangerous to the public, *whatever may be the cost to the parties introducing the danger.*" In that case, no part of the expense was borne by the public, and the whole cost, less a small percentage charged to public utilities using the streets, was imposed on the railroad, of eliminating fifteen grade crossings in the city of Erie, costing the railroad more than $2,000,000, which it could ill afford to pay, and the city was required to pay nothing. This was not regarded as an unreasonable exercise of the police power of the State.

In the recent case of St. Louis v. Nash, 260 S. W. 986, we said (per Woodson, J.) : ''V. In the exercise of police power of the State, a municipality may lawfully require a property owner to *alter* or *reconstruct* an existing building without compensation, when such alteration or reconstruction is reasonably necessary to insure the public safety or to protect the public health'' —citing many cases.

(b) Nor does the fact that the grade and location of the Wabash tracks through Forest Park were made pursuant to contract between the Park Commissioners and the railroad, or that the Wabash has leased its tracks to the Rock Island, prevent the State from eliminating dangerous grade crossings at the expense of the railroads. The police power of the State to so require cannot be surrendered by contract or compromise. All such contracts are void. [Northern Pacific Railway v. Duluth, 208 U. S. 583; State ex rel. v. Public Service Commission, 271 Mo. 286; American Tobacco Co. v. St. Louis, 247 Mo. 433.]

(c) It is true, as asserted by respondents' learned counsel, that this court has held that private property— which would include the right of way and property and moneys and funds of railroad—under our Constitution cannot be appropriated without compensation by the State merely to please the eye or gratify the æsthetic taste of the public or any part of it. [St. Louis v. Dorr, 145 Mo. 466; St. Louis v. Dreisoerner, 243 Mo. 223; State ex rel. v. McKelvey, 301 Mo. 1; City of St. Louis v. Evraiff, 301 Mo. 231; State ex rel. v, Davis, 259 S. W. 81.]

*Aesthetic Purposes.*

(d) But we hold that it does not appear to our satisfaction from the evidence in this case that the order of the commission complained of takes any of the railroads' property or funds merely to ornament or preserve the attractiveness of the neighborhood. Admitting that the city plan adopted by the commission involves a greater expense than the Wabash plan, and that the Wabash plan is all that is necessary to eliminate the grade crossing.

*Defacement of Residential District.*

at Delmar Boulevard, and that the city plan includes expenditures for preserving or improving the attractiveness of the vicinage, not in the Wabash plan, it does not follow that the city plan will impose any greater cost on the Wabash than the Wabash plan itself, because constitutionally the whole cost of the Wabash plan could be imposed on the company, whereas the order of the commission, while adopting the city plan, only imposed sixty per cent of the cost thereof upon the Wabash Company, and a large percentage, forty per cent thereof, on the city. Our statute, in authorizing the commission to require the municipality to pay a just and reasonable part of the expense of eliminating grade crossings, contemplated that just such controversies might arise as the one before us, in which the city might contend for a plan that would mar and disfigure the vicinity less, but be more expensive, than the plan proposed by the railroads. In all such cases, if otherwise reasonable and just, the statute authorizes the commission to adopt the city plan, and it can obey the Constitution by imposing upon the city such portion of the cost as to fully meet the extra expense of the city plan caused by reducing the defacement of the district to the minimum. We think this was fully done in this case by imposing forty per cent of the cost upon the city. The carrier can only justly complain of the expense if the city plan causes it more expense than its own plan. If the Wabash plan in this case were adopted, it would, in our judgment, damage, without redress, the vicinity many thousands of dollars by defacing and disfiguring it, and it would not be unjust to impose the whole cost thereof upon the railroad and no part thereof upon the city.

So as to the complete plan of the city as to eliminating all grade crossings south of Delmar Boulevard through Forest Park to Kingshighway; if the cost of the city plan, which in our judgment and that of the commission is much less destructive of the attractiveness and value, without need for recompense or remedy,

of the beautiful residence district and Forest Park, exceeds the cost of the Wabash plan, which is a matter of grave doubt in the record, the commission has power to impose such part of the cost on the city as to absorb all the extra cost of its plan and thereby prevent all injustice to the railroads.

We rule there is no violation of any constitutional provisions in the order complained of in the city plan for eliminating the grade crossing in question.

All things considered, we hold that while the city plan at Delmar is, perhaps, not so entirely perfect and desirable as the railroad plan for its purposes, we cannot see that there is any substantial difference to the railroad which plan is adopted, except as to the cost. We hold the Wabash plan is destructive of the interests of a large number of people in the vicinity who would be left without redress, as well as to the general public, by impairing and marring the beauty of perhaps the most attractive residential district and park in the city of St. Louis. While, therefore, the city plan is or may be substantially more expensive than the Wabash plan, as assumed by the commission, it does the minimum injury to the city and its inhabitants and is just to all concerned. Any injustice to the railroad on account of its greater cost is fully met in our judgment by the imposition of forty per cent of the cost upon the city of St. Louis, by the order of the majority of the commission.

V. While it is necessary that railroads be operated through Forest Park, public policy, justice and reason
Tracks demand that they should be so constructed
Through therein as to deface the park and endanger its
Park. use by the public as little as possible.

In Joy v. St. Louis, 138 U. S. 7, the court held that under the contract between the Wabash Railroad and the city of St. Louis, as to its right of way through Forest Park, the provision that the Wabash should per-

mit other railroads to "use its right of way" on such just terms as might be agreed upon, required it to permit such other companies *to use its tracks* and they were not required to build and lay separate tracks of their own on the Wabash right of way, as contended by that company. Among other things, the court said that such provision in the contract was inserted because (page 42) "it was feared that the invasion of the park by railroads would not only affect unfavorably the landscape beauty of the park, but would also produce great danger to persons visiting it" and because it "protected the park and prevented its being defaced and injured by the construction of other railroads through it." On page 50 the court said: "Here is a great, public park (1379 acres) *one of the lungs* of an important *city, which, in order to maintain its usefulness as a park, must be as free as possible from being serrated by railroads;* and yet the interests of the public demand that it shall be crossed by a railroad. *But the evil consequences of such crossing are to be reduced to a minimum* by having a single right of way, and a single set of tracks, to be used by all railroads which desire to cross the park. *These two antagonisms must be reconciled,* and that can be done only by the interposition of a court of equity, which thus will be exercising one of its most beneficent functions."

The same may be said as to our Public Service Commission. It exercises one of its most beneficent functions when it reconciles the antagonisms between the public and the railroads, by providing for eliminating grade crossings in such manner as to mar and deface the beautiful residential districts and parks of a city as little as possible, taking into consideration the extra cost of so doing, if any, in fixing the share of the cost the municipality is to pay.

VI. The point made by respondents that Section 10459, Revised Statutes 1919 (Par. 2, sec. 50, of the original act) does not give the Public Service Commis-

sion power to determine the manner or plans of elim-
inating grade crossings, or whether it shall
be by the railroad passing under or over the

**Power of Commission.**

street, as the commission may determine, is
not well taken. We have decided to the contrary, and
that under said section the commission has full power
and authority to determine the manner, as well as the
terms under which grade separations shall be made.
[State ex rel. v. Public Service Commission, 271 Mo.
283-84.] There is nothing in State ex rel. v. Public Serv-
ice Commission, 301 Mo. 179, to support respondents'
contention. That case recognized the right of the com-
mission to determine the manner of such grade separa-
tions. The court said, page 195: "Let it be granted
therefore, that the *manner* in which a street or *road*
crossing is to be *installed,* used, and maintained has been
delegated to the Public Service Commission; the right
in the first instance to grant or refuse this privilege—
(to cross the street)—has been reserved to the munici-
pal authorities. That this division of the police power
has been wisely determined, no one familiar with the
organization of cities and counties  .  .  .  will deny."

So public good and common justice demands that
grade crossings should be eliminated in such manner
as to disfigure the surrounding neighborhood to a min-
imum degree, which can be justly and constitutionally
done by imposing the extra cost, if any on the city, as was
done by the commission, in our judgment, in the order
of the commission which imposed forty per cent of the
cost of the city's Delmar crossing plan on the city.

VII. The requirement of the city complete plan
that the Wabash remove its tracks about fifty feet in
Forest Park and about one hundred fifty feet at Union
and Lindell Boulevards is for the purpose of, and is in-
cident to, the elimination of all dangerous grade cross-
ings south of Delmar Boulevard to Kings-
highway. The city owns all the land, in-
cluding the land in Forest Park, necessary

**Re-Location of Tracks.**

to re-locate the tracks, and has an option on the land nec-

essary to be acquired at Lindell and Union Boulevards. Besides, the railroads have the power of condemnation and could constitutionally be required to exercise that power, if necessary, to carry out the complete city plan if ordered by the commission.

Our statute not only gives the Commission express authority to determine the manner and terms of separating grades, but expressly gives the commission all authority necessary to carry out its express powers. Section 10412, Revised Statutes 1919, provides: "Said commission shall possess all the powers and duties in this chapter specified and also all powers necessary or *proper* to enable it to carry out fully and effectually all the purposes of this chapter." The commission therefore has full power to require the railroad to acquire additional lands or rights of way by condemnation, if necessary, and re-locate its tracks in order to eliminate grade crossings to carry out just and reasonable plans adopted by the commission for so doing. Everything supplied by the railroads and by the city, respectively, in executing the city complete plan, when they come before the commission, can be, and no doubt will be, taken into account by the commission in determining the share of the cost to be imposed on each.

VIII.   The right to determine whether, in case of a grade separation, the tracks shall go under or over the street, it is claimed, is vested in the railway company by virtue of Section 9944, Revised Statutes 1919, relating to railroads. That section is as follows: "Every such corporation shall construct and maintain good and sufficient crossings, where its railroad crosses public roads or town streets, now or hereafter to be opened for public use. . . . *Provided, that such corporation may make such road or street to pass under its said railroad where the same can be done with equal convenience and safety to the traveling public.*" This section only purports to give

Right of Railroad Company.

the railroad the right to make the road or street pass under its railroad and not over it.   But we held that said Section 9944, so far as it gives railroads any right to determine the *manner* of crossing public streets and roads, is repealed by said Section 10459, which clearly vests in the Public Service Commission the *exclusive* right and power to determine and prescribe the *manner* each and all crossings of public roads by railroads shall be constructed, including crossings where there is a separation of grades required by the commission.   There is nothing to the contrary ruled in State ex rel. v. Public Service Commission, 301 Mo. 179, relied on by respondents.   In that case, we held that the exclusive power to prescribe *the manner* of railroads crossing a street given to the Public Service Commission, did not give the commission power to authorize a railroad to cross a street in Kansas City without the consent of the municipal authorities.   Section 9850, Revised Statutes 1919, relating to railroads, provides: "That nothing herein contained shall be construed to authorize the construction of any railroad across any street in a city . . . without the assent of the corporate authorities."   That the manner of such crossing, after the city had assented to such crossing being made, was in the discretion of the Public Service Commission is clearly implied by what is said in said cause at page 195 (301 Mo. 179).   Judge WALKER there says: "Let it be granted, therefore, *that the manner in which a street or road crossing is to be installed, used, and maintained* has been delegated to the Public Service Commission, the right in the first instance to grant or refuse this privilege has been reserved to the municipal authorities.   *That this division* of the police power has been *wisely determined,* no one . . . will deny."

IX.   It is earnestly suggested that the only constitutional justification for the exercise of the police power of the State to require railroads to eliminate grade cross-

306 Mo.—12

ings at their own expense is founded on the right of the

**Cheapest Plan.** State to protect the lives and limbs of its citizens, and that, therefore, the cheapest plan of doing so must be adopted and that the railroads cannot be required to pay for preventing and disfiguring of the district or improving its appearance. There might be some place for this argument were the whole cost of the separation of grades imposed on the railroads. But in this case, the large percentage of the entire cost imposed on the city fully pays for the excess cost, if any, of the city plan, and therefore the argument that the order complained of requires the railroad to pay for beautifying or preventing the disfigurement of the residential district and Forest Park, along its route, is not tenable. The very purpose of giving the Public Service Commission power to require the city to pay part of the expense of eliminating grade crossings was that its rights and that of the inhabitants of the city should pay part of the expense, which in this case was forty per cent, besides that paid by other public utilities, so that it is unlikely that more than half the cost is imposed on the railroad. The record shows that by acquiring a small tract (which it may not even be necessary to condemn as the city has acquired an option to purchase it) and moving their tracks less than one hundred feet south at the intersection of Union and Lindell Boulevards, the crossing will be at the junction of those boulevards, and only one crossing there will be necessary, one under each street about a hundred feet apart. So by acquiring and using certain strips of ground which the city has already acquired, the Wabash right of way may be widened and will ultimately more readily accommodate its proposed four tracks than under its own plan, and at the same time do the minimum damage to the private property in the district and to Forest Park. Forest Park belongs to the city and it can give a strip to widen the railroad right of way to aid in eliminating the grade crossings as proposed by it. [State ex rel. v. Schweick-

ardt, 109 Mo. 496.] The land the city furnishes can be taken into the account in fixing the amount it will have to pay.

We hold, therefore, that no constitutional barriers are presented to the city plans, considered singly or jointly.

X.   There was evidence that there was more or less danger from seepage of water in case the depression or cut proposed by the city larger plan is carried out, but also evidence that such seepage could be cared for by proper sewerage. By the city com-
Clearance.
plete plan the grade of the tracks would be eight-tenths of one per cent, which is less than the present grade, and not an unreasonable grade. By the Wabash complete plan, the maximum grade would be 0.44, but the advantage of this is largely neutralized by the fact that, in many places in the remainder of its road, the grades are one per cent or more. The respondents also complain that the city viaducts proposed will only afford a clearance of eighteen feet for the operation of their engines and cars, which is not sufficient to allow employees to stand on the top of the highest cars while passing under them. But it is enough to permit the highest engines and cars themselves to freely and safely pass and the fact that Kingshighway tunnel has only a clearance of seventeen feet and three inches, and the bridge on the Wabash at the St. Charles road crossing of only eighteen feet and four inches, and that a clearance of eighteen feet is quite general, although frequently a greater clearance obtains, in our judgment makes the eighteen-foot clearance proposed by the city for its viaducts not unreasonable. It is shown that the topography is such that a greater clearance is not practicable.

XI. It is also contended that the power of the State Public Service Commission to require the railroads to pay any part of the expense to construct the viaduct ordered by the commission, is taken away by Section

20 (A) of the United States Transportation Act, which

**U. S. Transportation Act.** prevents interstate carriers, such as the Wabash and Rock Island Railroads, from issuing stocks or bonds, or extending their main lines, without the approval of the Interstate Commerce Commission. That in Railroad Commission of California v. Southern Pacific Railroad, decided by the United States Supreme Court, on April 7, 1924, it was held, TAFT, C. J., delivering the opinion, that a new union station to be constructed by the interstate railroads in Los Angeles, California, among other things, eliminating many grade crossings, and costing from $25,000,000 to $45,000,000, could not be required to be built by the State Public Utilities Commission of California, because it would require the issue of stocks and bonds by such railroads, which could only be issued with the consent of the Interstate Commerce Commission, and would also require the extension of the main lines of such railroads, without a certificate of approval from said Interstate Commerce Commission, all contrary to said Transportation Act of 1920.

In the case before us, it is not alleged, and the evidence does not show, that the expense of elimination of the grade crossing at Delmar Boulevard is so great as to require an issue of stocks or bonds by the defendant railroad or railroads, or that their main lines are required to be extended. We think the contrary is true. But Chief Justice TAFT also says in his opinion: "One might, too, readily conceive of railroad crossings or connections of interstate carriers in which the exercise by a state commission of the power to direct the construction of merely local union stations or terminals without extensions of main tracks and substantial capital outlay should be regarded as an ordinary exercise of the police power of the State for public convenience and would not trench upon the power and supervision of the Interstate Commerce Commission in securing proper regulation of

an interchange of interstate traffic or passengers.''
In our judgment, the elimination of the grade crossing
sought in this case comes within the above suggestions
of the learned Chief Justice, as one of a local character
and involves only the ordinary exercise of the police
power of the State for public convenience and safety,
and the cost thereof is not so great as to trench upon
the powers of the Interstate Commerce Commission
conferred by the Transportation Act.    That act does
not expressly, nor by implication, give the Interstate
Commerce Commission power to eliminate grade cross-
ings, nor prohibit the state authorities from so doing.
There is no conflict between the recent case decided by
Chief Justice Taft, and the case of Erie Railroad Co.
v. Public Utilities Commission, 254 U. S. 395, which
holds that the State had power to order the elimination
of grade crossings at the expense of railroads, and that
this in no manner brings the State's order in conflict
with any provision of the Federal Constitution or inter-
feres with interstate commerce.

XII.   Both parties have assumed that no property
owners adjoining the railroad right of way can legally
recover damage for injury to the value of their property
on account of the cut or depression in such right of way
contemplated by the Wabash plan, except
Damage to
Private Property.   where the grade of streets is changed,
either lowered or elevated, adjacent to
such property.    We do not wish to be understood as
either consenting to or denying that view.  We cannot
pass on that question in this case and do not pass on it.
But whether that assumption is true or not, we think
by far the greater damage to private property in the
district, whether adjacent to the railroad or not, will
be done by the Wabash embankment plan.

In our judgment, the order of the majority of the
commission was lawful, reasonable, and just.    Accord-
ingly, we reverse the judgment of the circuit court, and

direct it to affirm the order of the majority of the Public Service Commission herein. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion was prepared by our late Commissioner, CHARLES E. SMALL. It is adopted as the opinion of the court. All of the judges concur, except *James T. Blair, J.,* not sitting.